# FIRST NATIONAL BANK OF SPRINGDALE *v.*
## Lloyd G. HOBBS et al

5-5123                                               450 S. W. 2d 298

Opinion delivered February 16, 1970

*Crouch, Blair, Cypert & Waters,* for appellant.

*Bethell, Stocks, Callaway & King,* for appellees.

CARLETON HARRIS, Chief Justice. Lloyd G. Hobbs is president of S. & H., Inc., and these parties are appellees. On September 12, 1966, Jack Starnes entered into a 10-year lease agreement with S. & H., whereby Starnes was to lease and operate the Holiday Inn Motel in Springdale. The lease provides for certain rentals, the minimum monthly rental being $6,000.00 per month for the first year, $7,000.00 per month for the second year, and $7,500.00 per month for the third and subsequent years of the lease term. Paragraph 3 provides that, in order to secure and insure payment of the rentals, the lessee agrees not to withdraw as salary from the income acquired from operation of the property an amount in excess of $800.00 per month gross without the written consent of the lessor. It was further agreed that all receipts should be deposited in a bank account, and that all disbursements (other than petty cash items) should be made by check on said account. Further, that the lessor might require that all funds be disbursed from the account only upon a check countersigned by an officer or other representative of the lessor. Paragraph 5 provides that Starnes agrees:

"* * * to observe and fully keep and perform at his expense all obligations, covenants and agreements imposed upon or assumed by Lessor as a licensee under the terms of that certain License Agreement granted by Holiday Inns of America, Inc., under date of June 28, 1965; (b) to operate the premises demised herein as a 'Holiday Inn' Restaurant, according to the terms of said License Agreement; and (c) to keep said License Agreement in full force and effect during the entire term hereof, and, if Lessee should fail to do so, Lessor may, but shall not be obligated to, take any action Lessor deems necessary or desirable to cure any default

by Lessee in the performance or observation of any of the obligations, covenants and agreements due under said License Agreement, and Lessee hereby agrees to pay Lessor immediately and without further demand all such sums so paid and expended by Lessor in curing any such default * * *."

The record reflects that about September 15, 1966, Hobbs and Starnes went to the First National Bank of Springdale and talked with Mr. Robert Moore, president of the bank. Moore was already acquainted with Hobbs, but had not previously met Starnes. An account was opened, termed, "Holiday Inn Operating Account." According to the evidence, Hobbs told Moore that he was entering into a lease with Starnes, and that they would open the aforementioned account, this account requiring two signatures for any check written on it, the signatures to be that of Starnes and Hobbs.[1] Starnes mentioned that someone would be needed to sign the checks during the absence of Hobbs, and it was agreed that David Curry, Hobbs' son-in-law, would come to the bank, sign the signature card, and that he could then sign checks along with Starnes or even with Hobbs.

Within a few days, Curry signed the signature card, and Mrs. Starnes also went to the bank and talked with Nancy Tucker, a bank teller. Miss Tucker testified:

"Well, when she first came in, she had the Holiday Inn deposits so I took her deposit and then she took change in return to the Holiday Inn and when she was through, she told me she wanted to sign a signature card. So we had been told that she would be in to sign the cards and I asked her which one she was to sign and she said she didn't know. So I called upstairs and they sent them down and when I handed

---

[1]In the previous Holiday Inn account, Mrs. Hobbs had also been authorized, but there was no authorization for her signature on the new account.

them to her, I asked her if those were the ones and she said, yes."

Mrs. Starnes actually was supposed to sign two signature cards with her husband on two accounts (not involved in this litigation), the "Holiday Inn Advance Reservation," and "Holiday Inn—Payroll Account," and her name had been typed on these cards for signature; her name was not typed on the Holiday Inn operating account card. Subsequently, it appears that Mrs. Starnes signed numerous checks on the Holiday Inn operating account. Six checks signed by Mrs. Starnes are questioned in this litigation;[2] on five of these the co-signer was her husband, Jack Starnes; on the other, her co-signer was Curry. On November 20, 1966, a check in the amount of $12,000.00, made payable to Ruth H. Bell, Mr. Starnes' mother, was written on this account by Starnes and wife, and Mr. and Mrs. Starnes left town. Within a few days, the check was deposited in a Dallas bank, and subsequently honored by appellant. Appellees' evidence reflects that Hobbs learned of this check, and the others that had been signed on November 30, when a vice-president of the bank called and advised that the account was overdrawn.

On February 1, 1967, this appellee instituted suit against the First National Bank of Springdale, appellant herein, seeking judgment in the amount of $31,-001.49, this amount representing checks which Hobbs alleged had been wrongfully paid by the bank. It was alleged that the bank paid out this amount on the unauthorized signature of Mrs. Starnes, and improperly charged the Holiday Inn operating account, contrary to and in breach of the agreement entered into between the parties. The bank answered, asserting that the account was vested in Jack Starnes as lessee of the Holiday. Inn of Springdale; that Hobbs had no interest or claim to the funds deposited; further, that Hobbs had

[2]Other checks bearing her signature are not questioned, since it is conceded that the funds were drawn to pay legitimate bills of Holiday Inn.

notice and was fully aware that Mrs. Starnes was signing checks on the account, and was thus estopped from asserting that her signature was unauthorized; it was further denied that he sustained any damage as a result of the bank honoring said checks. Subsequently, S. & H., Inc., intervened, asserting that Hobbs was one of its principal stockholders, and seeking the same relief sought by appellee Hobbs. Following the filing of other pleadings not pertinent to the issue before us, the case was tried before a jury. A verdict was returned for Hobbs and S. & H., Inc., in the amount of $12,495.33, and, from the judgment entered in accordance therewith, appellant brings this appeal. Six points are asserted for reversal, and we proceed to a discussion of these points.

It is first contended that the operating account was vested in Jack Starnes, and neither Hobbs nor S. & H. had any right, title, interest, or claim to funds deposited in that account. At the conclusion of the plaintiff's case, appellant moved for a directed verdict on this basis, and also at the close of all the evidence, but both motions were denied. We agree that the trial court properly denied the motions. Appellant says that Starnes was only obligated to pay a specified rental for the leased premises, and the arrangement for two signatures was only a security arrangement between lessor and lessee, entered into for the purpose of securing to appellee, S. & H., its monthly rental. It is argued that Starnes was the owner of all receipts taken in by the Holiday Inn, and that the most appellees could be entitled to would be the amount of rent which had not been paid. It is also contended that neither Hobbs nor S. & H. were "customers" of the bank, within the meaning of Ark. Stat. Ann. § 85-4-104 (Add. 1961).

We disagree with these contentions, and it will be noted that the account was not carried in the name of either of these individuals or the corporation; rather, it was styled "Holiday Inn—Operating Account." However, it appears clear from the testimony of Robert Moore, president of the bank, and principal witness

for appellant, that the banker recognized Hobbs as the person mainly interested in setting up the account. Referring to the occasion when Hobbs and Starnes came to his office in the middle of September, Moore testified:

"*He*[3] asked me to get some signature cards, that *he*[3a] wanted to open a new account and let the Charlie Haile[4] account run its course, close itself." "

Moore stated that he assumed that the bank account belonged to both Hobbs and Starnes. The banker said that no one ever told him that Mrs. Starnes would have any authority to sign checks on the account, and also that no one ever told him that only Hobbs, Curry or Jack Starnes were to have signature authority. Subsequently, however, on cross-examination, the witness stated that Hobbs said that "he wanted his [Hobbs'] signature, his wife's signature and Jack Starnes' signature on the card," and Moore admitted that, if three people were authorized to sign checks on an account, two signatures being required to properly clear a check, the instrument would have to be signed by two of the three authorized persons; this, he stated, would constitute proper banking practice. The banker said that as far as he knew, no one ever gave the bank authority to add the name of Mrs. Starnes, and though other employees of the bank testified, none ever stated that they had been authorized to permit Mrs. Starnes to sign the signature card. It was established that the signing was due to the bank's error, and in fact, it is not argued otherwise. Section 85-4-104 defines a customer as:

"Any person having an account with a bank, or for whom a bank has agreed to collect items and in-

---

[3 & 3a] Emphasis supplied.

[4] The former operator of Holiday Inn.

cludes a bank carrying an account with another bank * * * *."

It seems clear from Moore's own testimony that Hobbs was the "customer" who opened the account, and directed the manner in which it was to be handled, but, to say the least, he was certainly as much a customer as Starnes.

We cannot agree that Starnes owned the account, or that the money belonged to him—or Hobbs' only interest was to secure his monthly rental payments. It will be noted within the provisions of the lease agreement, heretofore quoted, that Starnes agreed to fully perform all obligations and agreements imposed upon the lessor under the license agreement with Holiday Inns of America, and the lease further provided that, if Starnes should fail to observe and keep all agreements, the lessor might do so, and Starnes would pay the lessor all sums paid and expended by the latter in curing any such default. Hobbs testified that, as holder of the franchise, or licensee, he was responsible for the bills, and could not keep the franchise unless they were paid; that he paid bills that were incurred during Starnes' operation of the Holiday Inn in an amount in excess of $23,000.00, such bills being paid from his own revenues or the revenues of S. & H., Inc.

As previously stated, the lease agreement reflects that, from revenues taken in by the motel, Starnes was only entitled to $800.00 per month salary, and could not draw any further money himself until $50,000.00 had accumulated in the account. This did not happen.

It is next asserted that appellees breached the duty imposed by Ark. Stat. Ann. § 85-4-406 (Add. 1961) in failing to notify the bank of the unauthorized signature, and therefore were not entitled to recover. This section provides, in effect, that when a bank sends its customer a statement of account accompanied by items paid in good faith in support of the debit entries, or holds the statement and items pursuant to instructions

from the customer, or makes the statement and items available to the customer, the latter must exercise reasonable care and promptness in examining the statement and items to discover any unauthorized signature or authorization, and must promptly notify the bank thereof. Appellant argues that statements were available; that some of the items were not paid until after the availability of the statements, but the bank was not notified of the unauthorized signature. This is no defense for the bank, since the same section, Sub-section (3), provides "the preclusion under Sub-section (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." We see no need to discuss whether the statements were actually available to appellees, although it is not entirely clear that this was true, but we think unquestionably that the evidence establishes a lack of care on the part of appellant in paying the checks under discussion; at least, the proof certainly presented the question of whether bank employees were negligent in permitting Mrs. Starnes to sign the Holiday Inn operating account signature card, and thereafter honoring checks signed by her.

It is pointed out that five checks signed by Mrs. Starnes were also signed by either Curry or Hobbs, the first as early as October 15, that these checks were signed on the second line, indicating that Mrs. Starnes had already signed before either of these men. Yet, says appellant, the bank received no notice.

Hobbs testified that, at the time he signed the checks, Mrs. Starnes' signature had not already been placed upon them. Mr. Curry said that he signed every check placed in front of him by Mr. Starnes, but had no recollection of seeing the name of Mrs. Starnes already on the instrument. Of course, the fact that these men signed on the second line does not establish that the signature of Mrs. Starnes was already on the checks before the others signed; after all, the checks for expenditures were made out by the operator of the inn, and, as the maker of the bills, it would normally be

expected that he would sign on the top signature line. At any rate, the significance (or lack of it) of appellee's and Curry's signing on the second line, and whether this act indicated that Mrs. Starnes had already signed on the top line, or whether there was negligence, was a question for the jury, and evidently one that they considered, since they only allowed recovery on the checks signed by Mr. and Mrs. Starnes.[5]

It is also asserted that one check written to S. & H., Inc., was signed by Mrs. Starnes and Curry, and that this check was subsequently endorsed by Hobbs; thus, he had notice of the unauthorized signature, and should have notified the bank. Mr. Hobbs testified that his secretary frequently prepared deposit slips, and brought checks into his office which were to be deposited; that he endorsed them without ever paying any attention to the front side, because they were being taken to the bank for deposit. He emphatically denied ever seeing the signature of Mrs. Starnes. At any rate, as stated under Point Two, the question of negligence under the circumstances enumerated, was an issue for jury determination.

Appellant asserts that the court erred in giving its Instruction No. 11, which told the jury that the burden of proof was upon appellees to establish by a preponderance of the evidence the terms and conditions upon which the deposits were made with the bank, i. e., prove the number of signatures required for withdrawal and the names of the persons authorized to

---

[5]Apparently appellees recognized that recovery could not be obtained on checks reflecting Hobbs or Curry as co-signers, for they offered an instruction at the conclusion of the evidence directing the jury to find for appellees in the amount of $13,295.33. This amount covered the checks paid on the signatures of Mr. and Mrs. Starnes, plus one check signed by Mrs. Starnes and Curry. This last check was in the amount of $800.00, being a payment to an attorney which appellees contended was a personal obligation of Starnes, and should not be charged against the account. The jury evidently did not agree with this contention, since Curry was one of the signers. The verdict was $800.00 less (amount of the check to the attorney) than the $13,295.33 finally contended for by appellees.

sign the checks. The instruction then set out that when a bank accepts a deposit on agreed terms and conditions, it is held to strict accountability to pay out funds in strict compliance with those terms and conditions, and the burden to show that that was done is upon the bank. Appellant objected, stating that several elements such as ratification, negligence, etc., were not included in the instruction, and it was further contended that the instruction did not require a showing that appellee had an ownership interest in the account. We have already said that there is no merit in the ownership contention, and Instruction No. 12 presented the issue of whether appellees were negligent. The question of ratification was covered in Instruction No. 13. We find no merit to this contention.

As to Point Five, the record reflects that Hobbs was asked to state Moore's response when appellee demanded reimbursement for the checks erroneously paid. The witness replied:

"In the beginning, he was very concerned about getting the money reimbursed from his insurance company."

Appellant moved for a mistrial, and the court interrogated the jury as follows:

"Can the jury disregard anything in regard to insurance? * * * Just a minute now. Now, I am telling you to disregard this reference to insurance. It has no bearing whatsoever. Can you do that? Is there anybody who cannot completely disregard it and remove if from consideration in every form in this matter? I am not going to poll you individually but I am going to deny your request for a mistrial."

In *Back* v. *Duncan*, 246 Ark. 494, 438 S. W. 2d 690, we pointed out that the granting of a mistrial is a step so drastic as to be the exception, rather than the rule, as a means of correcting an error. There, we said that the trial court is only reversed if there is an

abuse of discretion involving manifest prejudice to the complaining party. We do not think that such drastic action was called for in this case. It does not appear that the question was asked for the purpose of showing that losses were covered by insurance;[6] certainly, any conversation between Hobbs and Moore was pertinent to the litigation, and it does not appear that the reference to insurance occurred in bad faith. We think the admonition by the court was sufficient to correct the error. *Lin Manufacturing Company of Arkansas, Inc. et al* v. *Courson*, 246 Ark. 5, 436 S. W. 2d 472.

Finally, it is contended that the court erred in permitting Hobbs to testify relative to the value of certain real estate, which Starnes' mother, at his behest, had deeded to S. & H., Inc. Appellant, under the theory that appellees were not damaged, asserts that the check from Starnes and wife to Mrs. Bell for $12,000.00 was in payment of real estate that Hobbs had purchased from her. Hobbs had testified that Starnes had offered the lot, located three and one-half miles from Longview, Texas, as security "simply because he did not have any money and he was trying to do anything he could to get me to lease him the Holiday Inn, therefore, he wanted to bring up anything he could to help this situation. This lot was actually taken just because he offered it and we didn't turn it down. I have never seen the lot, I don't feel it has any value of consequence but it was taken as security." This appellee testified that the lot was assessed at $250.00, and that he had paid three years' taxes, which had amounted to $1.14 per year. A state and county tax receipt for 1968, and a redemption receipt were offered in evidence. These exhibits, along with the testimony, were objected to by appellant, first as irrelevant, and second, as hearsay evidence. We agree that the exhibits were not in

---

[6]The record indicates that there is, or was, a dispute between the bank and the insurance company relative to coverage.

proper form for introduction, and we also agree that the evidence was irrelevant. It was evidently offered because appellant was claiming that the lot was worth $12,000.00, and that the check given to Mrs. Bell was to repay her for the property. This transaction was entirely alien to the question being tried, *viz.*, was the bank liable for honoring checks on a customer's account, such checks being executed by a person without authority to draw on the account? No instruction was given to the jury relating to this testimony, for it was not an issue between appellant and appellees, and we agree with counsel for appellees that any error committed was harmless.

The jury heard the evidence concerning the manner in which Mrs. Starnes became authorized to sign checks on the operating account. It also heard the evidence, pro and con, relative to whether Hobbs knew, or should have known, that Mrs. Starnes was signing checks. The contentions of both sides were fully presented. The jury found for appellees in the amount previously stated, and we find no prejudicial error.

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent because I feel that there was a failure of proof of an element essential to establishment of a prima facie case for recovery by appellees.

Appellant argued there was error in that evidence relative to the ownership of the account was not sufficient to sustain the verdict of the jury, in the giving of an instruction that the bank was held to strict accountability to plaintiff unless the funds deposited were paid out in strict compliance with the terms and conditions agreed upon as to signatures required for withdrawal, and in admitting evidence with regard to the tax assessment on certain real estate.

In order to put the matter in proper perspective, we must examine the evidence showing the interest of S & H, Inc., the real party in interest, in the funds deposited. Regardless of any conversations had among the interested parties, the interest of this appellee in these funds was established by the lease between S & H, Inc., and Jack Starnes. The extent to which these terms were made known to appellant is wholly immaterial, because if appellees had no interest in the funds, they suffered no loss and had no cause of action. Even Hobbs clearly stated that the bank account, along with a lot west of Longview, Texas, conveyed to S & H by Starnes' mother, and still owned by it, constituted security for performance of the lease. He also said that any money left in the account after the bills were paid would be the property of Starnes.

Paragraph 3 of the lease agreement provided that the bank account should secure and insure the payment of rentals and performance of other covenants in the lease. Clearly S & H had only a security interest in the account. The only showing of loss or damage to S & H, Inc., under the covenants of the lease was Hobbs' testimony that he had to pay bills incurred by Starnes in the Holiday Inn operation in the amount of $23,000. Appellees offered no evidence as to the value of the lot, and the only evidence to show its value was evidence relating to a tax assessment.

Under the instructions given by the court, and particularly the instruction objected to by appellant, the jury was told that the bank was held to strict accountability for failure to require the signatures agreed upon, which, in effect, permitted S & H to recover the full amount of the account without regard to the extent of its loss. This could result in an unjust enrichment at the expense of the bank of a secured party who suffered no loss. S & H was not entitled to be unjustly enriched. There must be a loss to enable recovery by a beneficiary of funds deposited in a bank and known by it to be trust funds even though the bank permitted diversion of these funds, because the beneficiary is not

entitled to unjust enrichment. *Bray Bros.* v. *Marine Trust Company,* 35 N. Y. S. 2d 356 (1937).

Under the circumstances existing here, it seems to be generally held that the burden is upon the claimant to prove his damage or loss as well as his interest in the funds deposited in the bank account.[1] In *Amarillo National Bank* v. *Harrell,* 159 S. W. 858 (Tex. Civ. App. 1913), it was held that a partner suing a bank to recover for wrongful conversion by transfer of a partnership bank account to the credit of the other partner could not recover the entire account but that he must allege and show his individual damage and interest.

In *Moore* v. *First National Bank of Kansas City,* 154 Mo. App. 516, 135 S. W. 1005 (1911), the bank appropriated funds on deposit to the credit of a depositor in his capacity as receiver of a corporation by honoring checks drawn on the account by the receiver for the payment of his individual debts to the bank. The court held that the burden was on the successor receiver to show that by reason of the misappropriation the trust had been depleted to the extent that there was an insufficient amount in the receiver's hands to pay existing liabilities or that the original receiver was delinquent to the estate in some amount. In *L. W. Cox & Co., Inc.* v. *Chemical Bank and Trust Co.,* 175 Misc. 1063, 26 N. Y. S. 2d 38 (1941), it was held that the payee of checks converted by a bank's honoring an unauthorized endorsement was not entitled to recover the full amount of the checks, but only to the amount by which the proceeds of the checks exceeded benefits received by the payee from the transaction.

In *Butler Produce and Canning Company* v. *Edgerton State Bank Company,* 159 Ohio 267, 112 N. E. 2d 23 (1953), it was held that an employer was not entitled to recover from a bank for funds obtained by his

---

[1]Even if Ark. Stat. Ann. § 85-4-103(5) (Add. 1961) applies as suggested by appellant, the Committee comment on this section clearly shows that this rule still applies.

employee by forgery of the employer's name when the employee had made restitution, because the employer was only entitled to be reimbursed once.

It has also been held that no recovery could be had from a bank for conversion of collateral security in the absence of proof that the claimant thereto suffered loss. *Porter* v. *Levering,* 330 Pa. 392, 199 A. 482 (1938).

The only evidence offered to indicate that the lot was not of sufficient value to reduce the amount of the loss suffered by S & H was the tax receipts purporting to show a tax assessment on the property. The tax assessment was not admissible for the purpose of showing the value of the land. *St. Louis I. M. & S. Ry. Co.* v. *Magness,* 93 Ark. 46, 123 S. W. 786; *Springfield & Memphis Railway* v. *Rhea,* 44 Ark. 258; *Texas & St. Louis Ry.* v. *Eddy,* 42 Ark. 527. In this state of the record the admission of this evidence over the objection of the appellant was prejudicial error.

I would reverse the judgment and remand the case for a new trial.