716 P.2d 246

**Victor F. LANDRUM, d/b/a Vic Landrum Trucking, Plaintiff-Appellee,**

v.

**SECURITY NATIONAL BANK OF ROSWELL, Defendant-Appellant.**

**No. 7875.**

Court of Appeals of New Mexico.

March 28, 1985.

Certiorari Quashed March 18, 1986.

Rod M. Schumacher, Lee M. Rogers, Jr., Atwood, Malone, Mann & Turner, P.A., Roswell, for defendant-appellant.

Ronald G. Harris, Ruidoso, Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, for plaintiff-appellee.

## OPINION

WOOD, Judge.

Victor F. Landrum (Landrum) had a checking account with Security National Bank of Roswell (Security). Landrum deposited checks into this account in February 1982. Landrum was not the payee of these checks. In August 1982, Security was informed that Landrum had forged endorsements on the checks deposited in February. "Forged Endorsement" affidavits were received by Security on August 27 and 30, 1982. Security put a "hold" on

Landrum's checking account on August 27, 1982, and removed the "hold" on September 7, 1982. Security refused to honor fifteen checks, written on the checking account, which were presented during the "hold." Landrum sued Security for wrongful dishonor. At the conclusion of the evidence the trial court ruled as a matter of law that there had been a wrongful dishonor and so instructed the jury. Only the question of damages was submitted to the jury. The jury verdict was for $50,000. Security appeals. We (1) state the background; and (2) discuss the propriety of the ruling that there was wrongful dishonor as a matter of law. We reverse and remand for trial, with directions that the issue of wrongful dishonor be submitted to the jury. Because the evidence on retrial may be different, we do not decide the damage issues raised by Security.

## BACKGROUND

Landrum is both a trucker and a truck broker. In early 1982 Landrum was the broker for R.W. Wheeler, Wheeler's sons, Dane and Ken, and Arnold Rose. They, along with Landrum, hauled materials for Yucca Oil Field Construction Company of Roswell (Yucca).

Yucca issued checks on its account with Security on February 12 and 22, 1982. The checks were payable to Dane Wheeler, Ken Wheeler, Rose and Landrum as individuals. The checks were in payment for services rendered. Either Landrum or his wife deposited these checks into Landrum's checking account with Security.

On August 27, 1982, Ken Wheeler executed an affidavit in connection with two checks issued by Yucca naming Ken as the payee. The affidavit is entitled a "Forged Endorsement Affidavit" and states that Ken "never received any benefit from or any value of said check or any part thereof, and further states that he did not present said check for negotiation or payment." Similar affidavits were executed by Dane Wheeler and Arnold Rose on August 30, 1982. Before executing the affidavit on August 27, 1982, Ken Wheeler and his father appeared at the bank. Ken stated that his endorsement had been forged and he wanted "that money back * * *." Security did not comply with this demand.

A "hold" was placed on Landrum's checking account on August 27, 1982. The supervisor of Security's bookkeeping department explained the hold on the basis of Ken Wheeler's claim. "[I]f the bank had done something wrong and accepted these checks over forged endorsements, that the bank still might have some liability regardless of the fact that six months had occurred * * *." The supervisor testified that the Wheeler claim would not have resulted in a chargeback to Landrum's account unless Landrum would have agreed to it. The supervisor attempted to contact either Mr. or Mrs. Landrum on August 27 concerning the claim, but was unsuccessful. We do not review Security's attempts to contact Landrum in this appeal. Those attempts, however, are relevant to the reasonableness issue to be decided upon remand.

The checks that were dishonored began arriving at Security on August 30, 1982. The notice rejecting payment stated "refer to maker." Fifteen checks were dishonored; most of the checks were written to merchants in Cuba, New Mexico, where Landrum was working at the time. The "hold" was lifted on September 7, 1982.

Testimony at trial is to the effect that the forged endorsement affidavits were false. There is testimony that the two Wheeler sons and Rose had received cash payment from Landrum for the pay period covered by the checks and that Landrum had authority to deposit the checks into Landrum's account. There is testimony that difficulties arose between Landrum and the Wheelers while working on the job at Cuba, that Landrum fired the Wheelers, that the forged endorsement claims were made as retaliation for the firing. The fact that the affidavits were false was not known by Security at the time of the "hold." What Security knew at the time of the "hold" was that a claim had been made that Landrum had deposited checks with allegedly forged endorsements.

## WRONGFUL DISHONOR AS A MATTER OF LAW

Statutory citations are to NMSA 1978 unless otherwise specifically noted. Security was the payor bank, see Section 55–4–105, both for Yucca's checks and Landrum's checks. Section 55–4–402 provides that a payor bank (Security) is liable to its customer (Landrum) for damages proximately caused by wrongful dishonor.

A dishonor is wrongful if "done in a wrong manner, unjustly, unfair, in a manner contrary to justice." *Allison v. First National Bank in Albuquerque*, 85 N.M. 283, 287, 511 P.2d 769 (Ct.App.), *rev'd on other grounds*, 85 N.M. 511, 514 P.2d 30 (1973). The Official Comment to Section 55–4–402 states that wrongful dishonor "excludes any permitted or justified dishonor * * *."

Landrum contends that failure to pay the fifteen checks was a wrongful dishonor. One of his theories is that Security charged back his checking account because the balance in his account was not enough to pay both the dishonored checks and the amount of the checks bearing the allegedly forged endorsements. Landrum asserts the charge-back violated Section 55–4–212 because there had been final payment not later than early March 1982. *See* § 55–4–213. This argument overlooks the undisputed testimony that a charge-back did not occur. What Security did was "freeze" the account by refusing to pay checks on the account during the "hold." The alleged violation of Section 55–4–212 does not support the ruling of wrongful dishonor.

Landrum's main theory of wrongful dishonor is that Security improperly placed a hold on his checking account on the basis of the forged endorsement claims. He asserts that our adverse claim statute, Section 58–1–7, barred any recognition of the claims because those claims were not made in compliance with Section 58–1–7. Security's position is that Section 58–1–7 does not apply.

Security asserts (1) that its "hold" on the basis of the forged endorsement claims was authorized by the common law and that the adverse claim statute did not supplant the common law; (2) the adverse claim statute imposed no duty on Security to its depositor Landrum; and (3) the adverse claim statute did not apply to the forged endorsement claims in this case. These contentions, well briefed and argued by both parties, determine whether there was a wrongful dishonor as a matter of law.

### 1. Relation of the adverse claim statute to the common law.

The parties agree that under the common law Security could have temporarily frozen Landrum's account. What was the common law rule?

The syllabus by the court in *Huff v. Oklahoma State Bank*, 87 Okl. 7, 207 P. 963, 963 (1922), states:

Where money is deposited in a bank to the credit of one person, and thereafter the bank receives notice that it is claimed by another, the bank upon proper notice is bound to hold the deposit a sufficient length of time to afford such person opportunity to assert his claim, and if the party has a reasonable time allowed him for the purpose of asserting his claim, and fails to do so, the bank may pay the deposit to the depositor without any liability to the adverse claimant.

*Stevenson v. First National Bank of Washington*, 395 A.2d 21, 23 (App.D.C. 1978), states:

When a bank has notice of an adverse claim to the money in one of its depositor's accounts it attempts to determine which party has the superior right at its own peril, for it will be held liable if it pays out the account erroneously. *See Jaselli v. Riggs National Bank*, 36 App. D.C. 159, 170–71 (1911). A bank, finding itself in the position of a stakeholder between two claimants, can avoid the potential liability for making an erroneous payment by either of two methods. Either it can interplead the claimants or it can freeze its depositor's account briefly to permit the adverse claimant to file

suit. *Gender [sic] v. Sibley State Bank*, 62 F.Supp. 805, 815 (N.D.Iowa 1945). "Under the majority rule the only duty owed by the bank to the plaintiff was, after notice, to hold up the ... deposit for such time as would enable the plaintiff by proceeding diligently and promptly to tie up the deposit by legal action." *Id.* Upon notice of a claim a bank can delay in paying out of the contested account for only a reasonable and brief period. *See Huff v. Oklahoma State Bank*, 87 Okl. 7, 207 P. 963 (1922) (upholding a jury finding that nine days was too long). If the innocent bank may incur liability by paying out erroneously on what appears to be a justified claim, and cannot avoid liability by honoring its deposit contract, it ought not to have to risk liability when it preserves the situation long enough for a judicial resolution of the primary dispute to be initiated. In this regard it makes no difference whether the parties file suit or the bank interpleads them. *Goldstein v. Riggs National Bank*, 148 U.S.App.D.C. 137, 459 F.2d 1161 (1972).

*See also Gendler v. Sibley State Bank; Sanders v. First National Bank & Trust Co. of Tulsa*, 292 P.2d 160 (Okl.1955).

At oral argument, Landrum conceded that the trial court's matter of law ruling was wrong if the common law rule applied. Landrum's position is that the common law rule no longer applies because of our adverse claim statute. Before discussing the statute, we point out the difficulty inherent in the common law rule. Holland, *An Analysis of the Legal Problems Resulting From Wrongful Dishonors*, 42 Mo.L.Rev. 507 (1977), states at 514–15:

When a person other than the depositor claims an interest in the funds in the depositor's account, the bank is placed in a difficult situation. Where the claim is valid, the bank may be liable to the claimant if it disregards the claim and allows its depositor to withdraw the funds. On the other hand, if the bank refuses to honor the depositor's checks because the funds have been paid to the claimant, that dishonor is wrongful if the claim proves to be invalid. The bank is under a duty to hold the funds for a reasonable period of time to allow commencement of legal proceedings by the claimant, so it should not be wrongful to dishonor the depositor's checks during this period. However, the bank must assume the risk of determining what is a reasonable period of time. The bank also is responsible for showing the proper reason for dishonor, *i.e.*, that the account is being held because of an adverse claim.

To alleviate the situation caused by conflicting claims to bank deposits, many states have adopted adverse claim statutes.

(Footnotes omitted.)

1925 N.M.Laws, ch. 89, § 1 provided: "Notice to any bank or trust company doing business in this State of an adverse claim to a deposit standing on its books to the credit of any person shall not be effectual to cause said bank to recognize said adverse claimant unless said adverse claimant shall also" (a) either procure a restraining order, injunction or other process against the bank in a cause in which the depositor is made a party and served; (b) or execute a bond to the bank indemnifying the bank from all liability on account of the payment of the adverse claim or dishonor of the check of the depositor; (c) provided, the law does not apply to certain situations where the depositor is the fiduciary for the adverse claimant.

The purpose of such a statute has been stated in varying ways. *Sanders* comments that a purpose of the statute is to eliminate the uncertainty in the common law rule. *Goldstein v. Riggs National Bank* states the statute was designed to protect the bank where it is subject to conflicting claims. "A statute designed to remove a bank from the precarious situation of being vulnerable to a law suit [sic] whichever course of action it took must cast its protection as broad as the possible liability." 459 F.2d at 1163. *Stevenson* indicates the statute "codifies" the common law.

Landrum contends the 1925 statute totally supplanted the common law rule. Security contends the statute supplanted only part of the rule. Security relies on cases which discuss whether, after enactment of the statute, a bank could file an interpleader action naming both the depositor and the adverse claimant as parties. A bank could proceed by interpleader under the common law rule. The interpleader cases are concerned with whether the technical requirements of interpleader, in existence at the time of the suit, had been met and whether the remedy of interpleader was barred by the statute. That does not concern us in this case.

Our concern is with the provisions of the statute dealing with an adverse claim to a deposit. At this point we assume that Ken Wheeler's comments to the supervisor and the forged endorsement affidavit amounted to an adverse claim within the meaning of the statute. The 1925 law was expressly directed to such a claim. Absent compliance with the statute, notice of the claim "shall not be effectual to cause said bank to recognize said adverse claimant * * *." Absent compliance with the statute, "nothing had been done which would prevent the bank's paying its depositor." *Kassow v. Integrity Trust Co.*, 19 Pa.D. & C. 159, 159 (1933). The 1925 statute modified the common law duty of a bank to recognize an adverse claimant.

Anticipating our holding as to the 1925 law, Security asserts our holding supports its view that Section 58-1-7, the current and applicable statute, was a change from the 1925 law, and this change gave it the option of recognizing an adverse claim under the common law rule. Landrum contends that Section 58-1-7 made no statutory change as to the recognition of an adverse claim.

1975 N.M.Laws, ch. 330, § 38 repealed the 1925 statute. The current statute, Section 58-1-7, was enacted as Section 8 of the 1975 law. Section 58-1-7 states:

Notice to any bank of an adverse claim to a deposit with such bank need not be recognized, and shall not be deemed effective, unless and until either the person making the claim supplies indemnity deemed adequate by the bank or the bank is served with process or order issued by a court of competent jurisdiction in an action in which the adverse claimant and the person or persons nominally entitled to the deposit are parties, provided that the bureau of revenue [revenue division of the taxation and revenue department] may levy against a deposit in accordance with the provisions of Section 7-1-31 NMSA 1978.

Security reminds us that because the legislature enacted a new statute we must presume that the legislature intended to change the law as it previously existed. *State ex rel. Bird v. Apodaca*, 91 N.M. 279, 573 P.2d 213 (1977). We agree. Security asserts that Section 58-1-7 permits, but does not require, Security to recognize an adverse claim. We do not agree.

A comparison of the 1925 law with Section 58-1-7 shows that Section 58-1-7 eliminated the provision of the 1925 law dealing with situations where the depositor is the fiduciary for an adverse claimant. It reworded, but continued, other procedural provisions—litigation or indemnification—for recognizing an adverse claim. Section 58-1-7 did make a change in procedure, but the procedural change is not pertinent in this case.

The "change" on which Security relies is the phrase "need not be recognized," in Section 58-1-7. Security contends this phrase permits it to recognize an adverse claim that does not comply with the procedural requirements of Section 58-1-7. Landrum asserts that the "need not be recognized" phrase cannot be isolated from other statutory words, that the phrase to be considered is "need not be recognized, and shall not be deemed effective * * *." Our view is that the "need not be recognized" phrase in Section 58-1-7 is a rewording of a phrase in the 1925 statute, "shall not be effectual to cause said bank to recognize * * *." The substantive provisions of Section 58-1-7 are a rewording

of the substantive provisions of the 1925 statute.

■ The rewording of Section 58–1–7 did not restore the common law rule that a bank had a duty to recognize an adverse claim. Section 58–1–7 provides that notice of an adverse claim is not an effective notice unless the claimant complies with the procedure set forth in Section 58–1–7. The forged endorsement claims were not in accordance with Section 58–1–7; those claims were not effective notice under the statute. Insofar as Section 58–1–7 applies in this case, that statute did not permit Security to handle the claims under the common law rule.

### 2. Duty under the adverse claim statute.

Security states:.

[B]ecause the statute is intended for the protection of banks, it does not create a duty owed by a bank to its depositor because the depositor is not within the class of persons intended to be protected by the statute. * * *

\* \* \* \* \* \*

\* \* \* [A]dverse claims statutes have been enacted for the protection of banks, not depositors. The sole purpose of the statute is to permit banks to refuse to honor an adverse claim that does not comply with the statute, without fear of being liable to the claimant for paying the funds over to the depositor.

On the basis that Section 58–1–7 established no duty on Security's part to its depositor Landrum, Security asserts "there is no basis for liability."

There are passing references in cases involving statutes identical or similar to the repealed 1925 law, stating that the adverse claim statute involved a duty to a depositor, but we found no extended discussion of a duty arising from the statute. A "duty" discussion on the basis of the statute would be misdirected and, thus, is unnecessary.

■ Where, as in this case, the adverse claimant does not comply with Section 58–1–7, Security had no notice of an adverse claim that came within that statute. Yet, the noncomplying claim was Security's basis for dishonoring fifteen of Landrum's checks. In this situation, the question is not one of duty to a depositor under Section 58–1–7, but a duty to a depositor under the terms applicable to a checking account against which there was no adverse claim. There was a debtor-creditor relationship between Security and Landrum. *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966). There is no claim that Security could have properly dishonored the checks on the basis of that relationship. Thus, our answer to Security's "duty" argument is that it makes no difference in this case whether Section 58–1–7 imposed a duty on a bank to its depositor. Such a duty is not needed to establish wrongful dishonor in this case.

### 3. The adverse claim statute did not apply to the forged endorsement claims.

Security's contention is that Section 58–1–7 did not apply to the forged endorsement claims. We discuss (a) the bank's potential liability for paying on a forged endorsement, and (b) whether a forged endorsement claim is an adverse claim within Section 58–1–7. We hold that the adverse claim statute did not apply.

#### (a) Forged endorsements.

If the endorsements of the payees had been forged, Security was potentially liable to the payees for conversion. Section 55–3–419(1)(c); *Casarez v. Garcia*, 99 N.M. 508, 660 P.2d 598 (Ct.App.1983). The right of Security to recover from the depositor, Landrum, *see* Sections 55–3–417 and 55–4–207, does not change the fact that Security could be held liable for conversion.

If the endorsement of the payees had been forged, Security was also potentially liable to Yucca, the drawer of the check, because a check bearing a forged endorsement is not properly payable. *See* J. White and R. Summers, *Uniform Commercial*

*Code* § 17–3 at 657–59 (2d ed. 1980); §§ 55–3–404 and 55–4–401(1).

Our point is that the forged endorsement claims were claims against Security for conversion.

**(b) Is a forged endorsement claim an adverse claim within the meaning of Section 58–1–7?**

The cases deciding whether there is an adverse claim under statutes similar to Section 58–1–7 have involved a claim to a specific deposit.

In the following cases there was an adverse claim to the deposit. In *Huff* the account was in the name of the husband; after husband and wife separated, the wife claimed the money in the account. In *Gendler* the wool purchaser claimed money in the account on the basis of overpayment for the wool. In *Sanders* the claim was to cashier's checks issued by the bank to McDonald. In *Goldstein* a corporation claimed funds in an account of an individual. In *Stevenson* a bank claimed funds in an account in the name of an individual at a savings and loan association. In *First National Bank of Portland v. Reynolds*, 127 Me. 340, 143 A. 266 (1928), the issue was whether the funds on deposit were those of an individual, or the individual as executrix of her husband's estate. In *Back v. Bowery Sav. Bank*, 162 Misc. 403, 294 N.Y.S. 818 (1937), the wife claimed a deposit which was in the husband's name.

In the following cases, there was no adverse claim to the deposit. In *Baden Bank of St. Louis v. Trapp*, 180 S.W.2d 755 (Mo.App.1944), the deposit was in the name of Irene Trapp and Iva Reaves. Bonny Reaves was divorced from Donald Reaves, the son of Iva and the brother of Irene. Bonny sought to garnish the account on the basis that Donald had failed to pay child support. Bonny claimed that funds in the account belonged to Donald. It was held that Bonny was not an adverse claimant under the adverse claim statute. An adverse claimant

is one who claims that a deposit belongs to him instead of to the one to whose

credit it stands on the books of the bank. * * * But Bonny * * * does not claim that the money on deposit in the names of Irene * * * and Iva * * * belongs to her. On the contrary, she claims that it belongs to her divorced husband, Donald * * * and, being his, is subject to be attached on garnishment in aid of an execution issued upon a judgment she holds against him for the support of their two minor children. If Donald * * * were himself making the claim for the deposits, he would be an "adverse claimant" as against Irene * * * and Iva * * *.

180 S.W.2d at 759.

In *First National Bank of Arizona v. Butler*, 82 Ariz. 361, 313 P.2d 421 (1957), 62 A.L.R.2d 1113 (1957), a trustee in bankruptcy was not an adverse claimant to a bank account in the name of the bankrupts because the trustee, by operation of law, was vested with the title of the bankrupts. In *Perdue v. State Nat. Bank*, 254 Ala. 80, 47 So.2d 261 (1950), there was a joint savings account of husband and wife from which either could withdraw funds. The guardian of the husband, a non compos mentis, requested payment to him of the deposit. The wife also requested payment. *Perdue* held the statute inapplicable because an adverse claimant "means one who is not shown on the books of the bank as a depositor." 47 So.2d at 264.

Cases discussing the application of an adverse claim statute to a forgery claim are sparse. The following two cases involved forged endorsements, but neither decision discussed the impact of an adverse claim statute. *Boggs v. Citizens Bank & Trust Co. of Maryland*, 32 Md.App. 500, 363 A.2d 247 (1976); *622 West 113th Street Corp. v. Chemical Bank New York Trust Co.*, 52 Misc.2d 444, 276 N.Y.S.2d 85 (1966).

*Adams v. Trust Co. Bank*, 145 Ga.App. 702, 244 S.E.2d 651 (1978), also does not discuss the impact of an adverse claim statute on a forged endorsement claim. *Adams*, however, is helpful on the question of what a bank can do after notice of a claimed forged endorsement. Adams de-

posited a check in his personal checking account. The check was payable to his employer.

> [T]he proceeds remained the property of [the employer]; and the bank incurred potential liability to [the employer] upon cashing the check without proper endorsement. * * * Since Adams had acquired no apparent title to the check, the bank acted within its rights in seizing the proceeds from the check until it could determine whether he had converted the funds. Accordingly, Adams has no cause of action against Trust Company for damages for wrongfully withholding his money.

244 S.E.2d at 653 (citation omitted).

One case is cited in the briefs (we have found no others) which discussed the relation of an adverse claim statute to a forged endorsement, *Bell v. Citizens Nat. Bank of Elkins*, 122 W.Va. 312, 9 S.E.2d 143 (1940). Bell was the payee of a check. He turned the check over to his daughter for deposit to Bell's account. After a dispute between Bell and his daughter, Bell inquired of the bank as to how the check was deposited. He was told that the daughter had deposited the check in her own name. Bell informed the bank that he was the rightful owner of the proceeds of the check. The bank allowed the daughter to withdraw the proceeds. Bell's judgment against the bank was affirmed. The opinion states:

a) If a negotiable instrument having a forged endorsement is collected by a bank, the proceeds are held for the rightful owner of the instrument, and the proceeds may be recovered by the rightful owner although the bank gave value for the instrument.

b) The daughter endorsed Bell's name and the proceeds of the check were diverted to the daughter's use without authorization.

c) The statute was not applicable.

 On the basis of the foregoing, we hold:

(1) Section 58-1-7 did not apply to the forged endorsement claims in this case because those claims were not "an adverse claim to a deposit" with Security. Rather, the claims were a claim of liability on the part of Security and this claim of liability was not directed to a deposit.

(2) Upon being notified of the forged endorsement claims, Security could properly place a "hold" on Landrum's checking account in order to inquire into the claims.

(3) Security must, however, act reasonably, both in its inquiry and the length of the "hold."

(4) Wrongful dishonor in this case depends upon the reasonableness of Security, and this is a question of fact.

The trial court erred in ruling that wrongful dishonor occurred as a matter of law. The judgment against Security is reversed and the cause is remanded to the trial court for proceedings consistent with this opinion.

Security shall recover its appellate costs from Landrum.

IT IS SO ORDERED.

DONNELLY, C.J., and ALARID, J., concur.