827 P.2d 1294

Carolyn G. **LIETZMAN**, individually, and Gary L. Smart, as Personal Representative for the Estate of Robert W. Lietzman, Deceased, Plaintiffs–Appellees,

v.

**RUIDOSO STATE BANK**, a New Mexico banking corporation, and Fred R. Heckman, Jr., Defendants–Appellants.

No. 19571.

Supreme Court of New Mexico.

March 10, 1992.

Kemp, Smith, Duncan & Hammond, John P. Eastham, Charlotte Lamont, Albuquerque, for defendants-appellants.

Calvin Hyer, Jr., Albuquerque, for plaintiff-appellee Smart.

J.S. Campbell & Associates, John S. Campbell, Albuquerque, for plaintiff-appellee Lietzman.

## OPINION

RANSOM, Chief Justice.

This suit arises out of failed efforts by Carolyn Lietzman to prevent the withdrawal of funds from an account at the Ruidoso State Bank after the death of her husband, Robert Lietzman. Carolyn Lietzman claimed that funds in the O–Bar–O Property Development account belonged to her and her husband even though neither of their names appeared on the account signature card maintained by the Bank. The only signatory was Fred Heckman, who was able to transfer the funds to another account despite Carolyn Lietzman's efforts. Heckman was a business associate of Robert Lietzman, but purportedly had been hired by a corporate entity, O–Bar–O Ranch, Inc., to pursue a real estate development project on the O–Bar–O Ranch where the Lietzmans lived. Carolyn Lietzman and the personal representative of the estate of her deceased husband later brought suit against the Bank for loss of the funds. The Bank appeals from the judgment entered against it on a jury verdict awarding $157,222 compensatory and $75,000 punitive damages jointly to Carolyn Lietzman and to Gary Smart as personal representative. The Bank asserts on appeal that there was an absence of substantial evidence upon which to instruct the

jury on certain claims of the plaintiffs.[1]

█ The instructions referred to Carolyn Lietzman and Smart as "the plaintiff," and we will not look back from those instructions to the pleadings to consider whether the respective plaintiffs asserted distinct claims for relief.[2] The court instructed the jury that "the plaintiff seeks compensation from the defendant for damages which plaintiff claims were proximately caused by the breach of contract, breach of fiduciary duty, breach of the covenant of good faith, negligence and the prima facie tort committed by Ruidoso State Bank." There was no objection to any jury instruction at the trial. We therefore cannot review the correctness of the instructions, which became the law of the case. But we will review whether substantial evidence supported submission to the jury of the claims to which the motion for a directed verdict was directed on substantial evidence grounds, *Gerety v. Demers*, 86 N.M. 141, 142–43, 520 P.2d 869, 870–71 (1974), at least to the extent any lack of substantial evidence on a material issue was called to the attention of the trial court with some measure of specificity. *See Romero v. Mervyn's*, 109 N.M. 249, 784 P.2d 992 (1989) (where record for directed verdict lacks reference to claimed absence of evidence of consideration to support contract, appellate court will not address issue).

As considered on the motion for directed verdict and stated in the court's instructions to the jury, the contract claim was that, following the death of Robert Lietzman, the Bank agreed with Carolyn Lietzman that it would freeze (or seize) an account known as the O–Bar–O Property Development account, would do nothing to allow any person to remove any money therefrom, or would at least give Carolyn Lietzman the opportunity to obtain a court order to put a hold on the account. It was claimed that an implied term of the contract was that the Bank would not go out of its way or take affirmative action to notify the signatory on the account that he should withdraw money and transfer it to another account before Carolyn Lietzman could obtain a court order. It was claimed that the Bank breached the contract by notifying Heckman, the signatory, that he should withdraw all money from the O–Bar–O Property Development account, and by not allowing Carolyn Lietzman the opportunity to obtain the court order.

The fiduciary duty claim was that a fiduciary duty existed between the Bank and the Lietzmans and that the Bank breached that fiduciary duty in the manner more particularly set forth in the breach of contract and prima facie tort claims.

The good faith claim was that, under the Uniform Commercial Code, "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." NMSA 1978, § 55–1–203. The Bank, it was therefore urged, owed a duty to the Lietzmans to deal with them in good faith. " '[G]ood faith' means honesty in fact in the conduct or transaction concerned." Section 55–1–201(19). It was claimed that the duty was to deal with the Lietzmans in good faith in all respects whatsoever, which the Bank failed to do in the manner more particularly set forth in

---

1. No specific contest of punitive damages has been raised by the Bank under the points of its briefs or in argument, and, indeed, the Bank did not object at trial to the presentation of punitive damages for jury determination. Consequently, we do not separately address punitive damages in this opinion.

2. At trial Carolyn Lietzman represented herself pro se. At the request of the Bank, in response to the respective claims asserted by the plaintiffs in their amended complaints, the court did instruct the jury that defendant denied the contentions of Smart under the theories of breach of fiduciary duty, breach of implied contract and covenant of good faith, negligence, and prima facie tort; and that the Bank denied Carolyn Lietzman's contentions of breach of duty to stop payment, breach of duty of good faith, and breach of a fiduciary duty. Nonetheless, as with the statement of the plaintiffs' claims, the court's damage instructions to the jury and the verdict form treated the plaintiffs jointly and without distinction as to the various claims for relief.

the breach of contract and prima facie tort claims.

The negligence claim was that the Bank owed a duty to the Lietzmans not to do anything to cause them harm or damage, and the claim refers to a breach in the manner more particularly set forth in the breach of contract and prima facie tort claims. In addition to informing the jury of the standard definitions of "negligence" and "ordinary care," the court instructed the jury:

There was in force in this state, at the time of the occurrence in question, a certain statute which provided that:

55–4–405. Death or incompetence of customer.

(1) A payor or collecting bank's authority to accept, pay or collect an item or to account for proceeds of its collection if otherwise effective is not rendered ineffective by incompetence of a customer of either bank existing at the time the item is issued or its collection is undertaken if the bank does not know of an adjudication of incompetence. Neither death nor incompetence of a customer revokes such authority to accept, pay, collect or account until the bank knows of the fact of death or of an adjudication of incompetence and has reasonable opportunity to act on it.

(2) Even with knowledge a bank may for ten days after the date of death pay or certify checks drawn on or prior to that date unless ordered to stop payment by a person claiming an interest in the account.

If you find from the evidence that Ruidoso State Bank conducted itself in violation of the statute, then you are instructed that such conduct constituted negligence as a matter of law.

The jury also was instructed that "Every person has a duty to exercise ordinary care for the safety of the persons and the property of others."

Finally, the prima facie tort claim was that (1) the Bank acted intentionally and lawfully, (2) the Bank intended to injure the plaintiff, (3) the plaintiff suffered damages when the Bank allowed Heckman to withdraw the proceeds of the O–Bar–O Property Development account, and (4) the acts of the Bank were completely without any justification whatsoever, or with insufficient justification.

The thrust of the Bank's position, in its opposition to the plaintiffs' claims, was that Heckman, the sole signatory on the O–Bar–O Property Development account, was the sole customer of the Bank in relation to that account. Consequently, the Bank argued that it did not violate NMSA 1978, Section 55–4–405 because neither of the Lietzmans was a customer within the meaning of the statute. In its motion for directed verdict at the close of the plaintiffs' case, the Bank asserted that it clearly honored its contractual agreement under the O–Bar–O Property Development account. As to the covenant of good faith and as to negligence, the Bank based its motion for directed verdict "upon the facts that have been presented to the Court, that neither Ms. Lietzman nor her husband were on the signature account, that, I think, the testimony has been before the Court that Mr. Isaacs, although he may have known that the O–Bar–O was associated with Mr. Lietzman, I think that's the only fact before the Court...." Although the jury was not so instructed, Carolyn Lietzman made it clear, in response to a question by the court during argument on the Bank's motion for directed verdict, that she relied for her fiduciary duty claim on Sections 55–4–405 and 55–1–203. The Bank did not specifically reference fiduciary duty in its motion for directed verdict, but we deem that claim to be subsumed within the contract and the covenant-of-good-faith claims that were referenced. The Bank also moved for directed verdict on the prima facie tort claim "because there's just been no evidence by the Plaintiff that any officer of the bank knew anything. There's not been sufficient evidence to show that the bank in any way, by that

telephone call, was a direct or proximate cause of anything occurring."[3]

From our reading of the objections raised, we now consider what could be found to be the relationship of Robert Lietzman and Carolyn Lietzman to the O–Bar–O Property Development account, and our decision in turn will determine whether there was substantial evidence upon which to instruct the jury (1) on Section 55–4–405, (2) on breach of contract, breach of fiduciary duty, breach of the covenant of good faith, or negligence, and (3) on prima facie tort. In light of the objections made, the latter issue is limited to substantial evidence of the Bank's knowledge and of causal relationship. Both of the substantial evidence issues with respect to the prima facie tort claim are subsumed within the treatment we accord the issues concerning the first two claims.

As used in Article Four of the Uniform Commercial Code, a "customer" is "any person having an account with a bank or for whom a bank had agreed to collect items." NMSA 1978, § 55–4–104(1)(e). A "person" may be an individual or any other legal or commercial entity. *See* §§ 55–1–201(28), (30). Under these definitions, the Bank has argued variously that the sole customer with reference to the account was Fred Heckman (the party who opened the account and was the sole signatory), or O–Bar–O Ranch, Inc. (a duly formed and existing New Mexico corporation whose tax identification number was listed on the signature card), or "O–Bar–O Property Devel-

opment" (the name under which the account was opened). On appeal the Bank argues that the actual identity of the Bank's customer is not the relevant inquiry, and that what does matter is that Robert Lietzman was *not* a customer on that account.

The Bank relies in particular upon the resolution of a similar question involving the identity of a bank's customer in *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966). In *Loucks*, a partnership had a bank account in its own name, and the partners later brought suit under Section 55–4–402 for wrongful dishonor of a partnership check. This Court held that where the account was in the name of a partnership, the individual partners were not "customers" for purposes of Section 55–4–402, and for that reason the partners could not recover damages for any personal injuries they may have suffered. Rather, the partnership, a recognized legal entity that could sue in its own name, was determined to be the customer.[4] The *Loucks* decision has been criticized for what has been perceived as a narrow and technical rule—that an individual cannot be a "customer" of the bank with reference to an account opened in the name of a legal entity such as a partnership or corporation and not in his or her own name. *E.g., Schoenfelder v. Arizona Bank*, 165 Ariz. 79, 796 P.2d 881 (1990) (en banc) (holding that in view of bank's awareness of purpose of account and signatory's beneficial interest in account, trial court correctly de-

---

3. The attorney representing the Bank on appeal, and on the Bank's motion for judgment notwithstanding the verdict or a new trial, is not the same attorney who represented the Bank at trial. Several issues that the Bank attempts to raise on appeal were not timely raised at trial and we deem them not preserved. We will not consider issues when the trial court had no opportunity to address alleged error before the case was submitted to the jury. Issues raised in the motion for judgment n.o.v. or the motion for a new trial were subject to the discretion of the court, and we find no abuse of that discretion. *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 29–30, 766 P.2d 280, 289–90 (1988), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989). For example, on appeal, the Bank ar-

gues that there was no evidence of a promise or of consideration to support the breach of contract claim. It also argues that the prima facie tort claim should not have been submitted to the jury because the case was submitted to the jury under other accepted tort categories and because the doctrine of prima facie tort should not be applied retroactively. However, since the Bank did not raise or preserve these issues in a timely fashion, we will not now consider them.

4. The partners could recover for any damage suffered by the partnership, such as damage to its credit, reputation and business standing.

termined that the plaintiff was more than simply a mandatory signatory on corporate account, but was a "customer" with standing to maintain action for improper payment of unauthorized check).

■ In the case at bar, unlike *Loucks,* the account is not in the name of a legal entity such as a corporation or partnership. At trial, a representative of the Bank was unable to conclude exactly what type of account it represented—whether it was a corporate, partnership, or an individual business account. He concluded it was a business account with a conflict of name. Because the account was not in the name of any legal entity, one that could sue or be sued in its own name, our decision in *Loucks* is not controlling. Where, as here, the name on the account is not a legal entity, a variety of factors must be examined to determine who is a customer on that account. These include not only the name on the account and the authorized signatories, but also the circumstances surrounding the opening of the account, what persons control the account, and the beneficial interest of persons so associated with the account.

We are influenced in this conclusion by the opinion in *First National Bank of Springdale v. Hobbs,* 248 Ark. 76, 450 S.W.2d 298 (1970). In that case, a corporation and its president brought suit for improper payment of checks drawn on an account opened in the name "Holiday Inn Operating Account." The account had been opened by Hobbs, the president of a corporation (S. & H., Inc.) that was the holder of a Holiday Inn motel franchise, and Starnes, who had signed a ten-year lease agreement to operate the motel. Hobbs, Starnes, and Hobbs's son-in-law were to be signatories on the account, and two signatures were to be required for all checks. Through bank error, Starnes's wife also signed the signature card and subsequently several checks were drawn on the account without the signature of either Hobbs or his son-in-law.

When Hobbs sued, alleging the checks were wrongfully paid, the bank claimed that neither he nor the corporation was its customer under definitions of the UCC because the account was not carried in the name of either. The court rejected this contention, noting that the president of the bank had recognized Hobbs's interest in the account. The banker said he had assumed that the account belonged to both Hobbs and Starnes. The court also determined that neither the account nor the funds therein belonged to Starnes. Viewing the circumstances surrounding the opening of the account and the bank's knowledge, the court found that Hobbs was just as much a customer of the bank within the meaning of the UCC as Starnes. The fact that Hobbs was a signatory was not a determinative factor.

Here, neither Robert nor Carolyn Lietzman was directly involved in opening the account and neither was an authorized signatory. The account was opened by Heckman and he was the only signatory listed. However, a representative of the Bank, Preston Isaacs, testified that he recognized a connection between the O–Bar–O Ranch and Robert Lietzman. When asked why he associated the O–Bar–O Ranch with Robert Lietzman, Isaacs testified " 'Cause he owned it." This was knowledge, or notice, of a possible beneficial interest by the Lietzmans and one circumstance among others concerning the O–Bar–O Property Development account that should have alerted the Bank that the Lietzmans may be customers in relation to the account.

Additionally, Isaacs spoke with Carolyn Lietzman when she called about the Property Development account. Isaacs pulled the signature cards to both the Property Development and the O–Bar–O Ranch accounts. He testified that he assumed the cards were related inasmuch as they both bore the name O–Bar–O. The O–Bar–O Ranch account was a business account that listed Robert Lietzman and his brother, P.F. Lietzman, as signatories. Isaacs testified that, because he knew that Robert Lietzman owned the ranch, it could be assumed that his wife had an interest in that

account. However, with respect to the O–Bar–O Property Development account he told Carolyn Lietzman that he could not freeze that account because only an authorized signatory on the account could order it frozen.

While susceptible to conflicting inferences, we think the evidence was sufficient to raise a factual question of whether Robert Lietzman was a "customer" of the bank with reference to the Property Development account. Significantly, the Bank was aware Robert Lietzman had a possible beneficial interest in the account. The Bank recognized that the appearance of "O–Bar–O" in the name of the account and Robert Lietzman's ownership of the ranch would suggest some relation between the account and Robert Lietzman. For this reason, Carolyn Lietzman's representation to Isaacs that the funds belonged to her and her deceased husband was a tenable claim. Under these circumstances we think the Bank acted at its peril in relying solely upon the information on the signature card. The facts known to the Bank did not define its "customer" in relation to the account, but those facts were sufficient to put the Bank on inquiry notice of the death of a customer and of his surviving wife's interest in the account. *See Landrum v. Security Nat'l Bank of Roswell,* 104 N.M. 55, 716 P.2d 246 (Ct.App.1985) (upon being notified of forged endorsement claims, bank could place a hold on depositor's checking account in order to make reasonable inquiry into claims), *cert. quashed,* 103 N.M. 798, 715 P.2d 71 (1986).

The jury also heard testimony on the question of the ownership of the funds. No issue in this regard has been raised on appeal, and we note only that Carolyn Lietzman testified that the funds had originated from a certificate of deposit in Robert Lietzman's name in a Singapore bank. There was, however, no evidence that Isaacs or the other representatives of the Bank were aware of this fact.[5]

We conclude that substantial evidence in the record supports the fact that Robert and Carolyn Lietzman were customers in relation to the Property Development account. As the case went to the jury, the Bank had staked its defense to all claims, in law or in fact, on the proposition that the Lietzmans were not customers in relation to the account, or that the Bank knew nothing of such relationship. For purposes of this appeal we must conclude in support of the judgment that the jury drew a contrary inference although they were not specifically directed to resolve the issue. Thus, under Subsection 55–4–405(1) the Bank was without authority to pay an item with knowledge of the death of its customer.[6] That Subsection states that the death of a customer does not revoke authority to

5. The Bank has never contended that the funds belonged to Heckman. Heckman testified that the funds belonged to O–Bar–O Ranch, Inc., and that it was O–Bar–O Ranch, Inc. who had hired him to pursue the real estate development project. Robert Lietzman was not an officer or shareholder in this corporation. The president of O–Bar–O Ranch, Inc. was Thon Voranata, a citizen of Thailand. Robert Lietzman deeded the entire O–Bar–O Ranch to this corporation in September of 1983. At that time Robert and Carolyn Lietzman were separated and were contemplating divorce. Carolyn Lietzman filed for divorce in January 1984 but states that she and her husband were reconciled shortly thereafter. In any case, the parties were still married at the time Robert Lietzman died in a helicopter crash in May 1985. The transfer of the O–Bar–O Ranch to the corporation was declared void by a federal court five years after Robert Lietzman's death because his wife had not joined in

the transfer of community real property as required by NMSA 1978, Section 40–3–13(A).

6. The Bank argued that because neither Robert nor Carolyn Lietzman were customers of the Bank for purposes of the Property Development account, Carolyn Lietzman's claim was an "adverse claim" unrelated to Subsection 55–4–405(1) and one the "Bank could ignore with impunity" because NMSA 1978, Section 58–1–7 requires either indemnity or a court order before a bank need recognize an adverse claim. Since we deny the Bank's major premise that the Lietzmans were not customers, we do not reach this argument. Under the verdict, Carolyn Lietzman could not be characterized as an adverse claimant. Furthermore, Section 58–1–7 is not a complete defense even if Carolyn Lietzman could be characterized as an adverse claimant. Here, the Bank's liability was predicated on Subsection 55–4–405(1) for transferring the

 

pay an item until the bank knows of the death and has had an opportunity to act on it. With respect to Subsection 55–4–405(1), the negative implication in the last sentence of that Subsection is that the death of a customer revokes authority to pay an item drawn on that person's account after the bank knows of the fact of death.[7]

For the foregoing reasons we affirm the judgment of the district court.

IT IS SO ORDERED.

BACA and MONTGOMERY, JJ., concur.

---

funds after knowledge of Robert Lietzman's death. Section 58–1–7 is not a defense to an "adverse claim" proved on its merits under Subsection 55–4–405(1). The Bank's recourse, when advised of Carolyn Lietzman's claim, was to place a hold on the account in order to make reasonable inquiry. This it could do without incurring liability to any creditor of the account. *See Landrum.* If Section 58–1–7 were not satisfied by an adverse claimant during the period of such a hold, the Bank could have chosen whether to recognize the applicability of Subsection 55–4–405(1). In choosing not to recognize the fact of a customer's death, however, a bank acts at its peril. When the death later is established as a fact to have been the death of its customer, the liability of a bank is defined by Subsection 55–4–405(1). That, in essence, is what happened here.

7. With knowledge of the death of a customer, under Subsection 55–4–405(2), a bank may not pay checks when ordered to stop payment by a person claiming an interest in the account. As counsel for the estate of Robert Lietzman conceded at oral argument, that Subsection is inapplicable to the facts of this case, as it applies to checks drawn on or prior to the date of death.