Justice PATTERSON
delivered the opinion of the Court.
In this appeal, the Court considers whether an individual who is not the customer of a bank can assert a common law negligence claim, premised upon the bank’s allegedly improper handling of a corporation’s funds transfers.
This case arose from a business venture that was established by plaintiff Brendan Allen (Allen) and defendant Asnel Diaz Sanchez (Sanchez). The venture was operated through plaintiff ADS Associates, Inc. (ADS), a corporation fully owned by Sanchez. Allen and Sanchez opened a business checking account in the name of ADS at a branch of Oritani Savings Bank (Oritani), where ADS had preexisting accounts. By agreement between ADS and Oritani, the new ADS account required the signatures of both Allen, who served as ADS’s Treasurer, and Sanchez to appear on each check drawn on the account. Despite that limitation, Sanchez linked the new ADS account to other ADS accounts within his control and, through a series of internet transactions, transferred a substantial sum of money from the ADS account he had established with Allen to his other ADS accounts.
After learning of these transfers, Allen sued Oritani and Sanchez. Although it dismissed Allen’s claims, the trial court permit *500 ted Allen to assert claims on ADS’s behalf against Oritani, notwithstanding Sanchez’s issuance of a resolution denying Allen the authority to maintain an action on ADS’s behalf. A jury returned a verdict in favor of ADS. The trial court, however, entered a judgment notwithstanding the verdict in favor of Oritani premised on an indemnification provision in the agreement governing ADS’s account with Oritani.
An Appellate Division panel reversed the trial court’s determination. It found that the ADS resolution signed by Sanchez deprived Allen of authority to assert a claim on behalf of ADS. The panel held, however, that Allen could assert a common law negligence claim against Oritani despite the fact that he was not Oritani’s banking customer. It concluded that, by virtue of their prior communications, Allen had a “special relationship” with Oritani, pursuant to this Court’s holding in City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 60-65, 764 A.2d 411 (2001), and that Oritani had a duty to advise Allen of its internet banking policies when he and Sanchez opened the ADS account.
We concur with the trial court that Article 4A of the Uniform Commercial Code (UCC), N.J.S.A. 12A:4A-101 to -507, governs the wire transfers at the center of this case, and that Allen may not assert a claim under Article 4A against Oritani because he does not meet the statutory definition of a bank “customer.” N.J.S.A. 12A:4A-105(l)(c). We further hold that Allen may not assert a negligence claim based upon an alleged special relationship with Oritani under City Check Cashing, supra, 166 N.J. at 59-62, 764 A.2d 411. The Legislature enacted Article 4A to comprehensively address the issues raised by funds transfers and to determine the rights, duties, and liabilities of the parties affected by such transactions. Allowing Allen’s common law negligence claim to proceed would undermine the statute’s objectives.
Accordingly, we reverse the determination of the Appellate Division, and reinstate the judgment of the trial court.
*501 I.
We derive our account of the facts from the trial testimony and documents admitted into evidence before the trial court.
In August 2003, Allen approached Sanchez regarding a potential business venture involving the removal of a dirt stockpile from a construction site for the Bergen-Hudson Light Rail project. When Allen learned of the Bergen-Hudson Light Rail project, he was interested in bidding on it, but concluded that to proceed with the venture he would need to operate through a corporate entity with a union contract and minority-owned business status. Consequently, Allen approached Sanchez, who was already the sole shareholder, officer, and director of ADS, a New Jersey corporation established in September 2001.[1]
Allen and Sanchez agreed to jointly bid on the project and perform the work should their bid be successful. According to Allen, Sanchez undertook the tasks of billing, preparing invoices, processing all paperwork, managing the checkbook, and reviewing bank statements. Further, Sanchez testified that he and Allen agreed that ADS would assume liability related to the work. Allen and Sanchez agreed that after all expenses related to the venture were paid, Allen would receive seventy percent of the profits and Sanchez would receive thirty percent.[2]
ADS was the successful bidder on the project and was awarded the Bergen-Hudson Light Rail contract. With the work about to commence, Allen and Sanchez agreed to open a bank account at Oritani, at which ADS already held accounts. According to Allen, the account was to be opened in ADS’s name because of ADS’s status as an established minority-owned business.
*502 On October 2, 2003, Allen and Sanchez visited Oritani to open the account. They met with Marlene Fabregas, a representative of the bank. Allen testified that he and Sanchez explained to Fabregas that they wanted to open an account separate from ADS’s preexisting accounts in order to cooperatively control funds relating to what they termed their “joint venture.” According to Allen, he and Sanchez advised Fabregas that they wanted a dual-signature account, on which neither individual could unilaterally write a check without the other’s signature.
The new Oritani account was opened under the name “ADS Associates Group Inc.,” with ADS’s tax identification number. The blank checks provided by Oritani included the notation “two signature lines required,” with spaces for both Allen and Sanchez to sign each check. Allen and Sanchez were listed as the authorized signatories on the account’s signature cards.
Allen testified that during the initial meeting with Fabregas, at the suggestion of Sanchez, he was given the title of Treasurer of ADS. On an Oritani form, Sanchez, acting as ADS’s Secretary, formalized Allen’s appointment as ADS Treasurer in a corporate resolution dated October 2, 2003. The resolution provided that Allen’s appointment would remain effective until it was rescinded or modified by ADS. Allen testified that it was his understanding that his role as Treasurer involved approving payments from the account.
Allen and Sanchez, acting on behalf of ADS, and Fabregas, acting on behalf of Oritani, signed the Bank’s “Business Checking Account” Agreement (Account Agreement).[3] The Account Agreement provided in part:
You will receive a monthly statement reflecting all account activity, all charges assessed therewith and the balance of your account, together with canceled checks for the period. In order to preserve your rights, you must examine the statement and report any problem or error with an account statement within 60 days after the statement is sent to you or [Oritani] is not liable for such problem or error. This includes a forged, unauthorized or missing signature or endorsement, a *503 material alteration, a missing or diverted deposit, or any other error or discrepancy-
The Account Agreement further provided that ADS would be “liable for any losses or expenses caused by [ADS’s] employees, owners, principals or agents who forge or alter any instrument or endorsement or make any unauthorized charge to [ADS’s] account.”
According to Allen, during the October 2, 2003 meeting, Fabregas explained that only ADS, as the account holder, would receive bank statements, and that Oritani would not separately mail bank statements to Allen. Therefore, Allen and Sanchez determined that it would be Sanchez’s responsibility to review the bank statements and to report any errors to Oritani.
In October 2003, when Allen and Sanchez opened the ADS account, Oritani offered its customers internet banking services, accessible to any authorized signatory on an account through a separate electronic banking application. At trial, Marjorie Lois Chup, a manager in Oritani’s electronic banking services, testified about Oritani’s internet banking policy. She stated that any individual who was an authorized signatory on an account could complete an application to gain access to the internet banking services using a selected code, and could then link the account holder’s existing accounts online.[4] The Account Agreement signed by Allen, Sanchez and Fabregas did not set forth any provision, or state any bank policy, regarding the linking of accounts via the internet. The internal Oritani Branch Procedures Manual in effect in 2003 did not expressly address internet transactions, but generally discussed funds transfers between Oritani accounts. It provided that “[a]ll signatures that are required for withdrawal of *504 funds from the ‘from’ account [must be] present” before a transfer between two Oritani accounts would be authorized.
Using his own funds, Allen made the initial deposit of $750 into the new ADS account, and later wired $28,000 into the account to cover payments to vendors. As Allen conceded in his testimony, all remaining deposits into the new ADS account were made by Sanchez. At a September 10, 2008 pretrial hearing, Sanchez maintained that he deposited between $200,000 and $400,000 of his own money into the account during the course of the project.
According to Allen, between October 2003 and June 2004, he and Sanchez met frequently to sign checks, which were used to pay ADS’s vendors and to reimburse Allen and Sanchez for expenses paid using their personal funds. At times, when Allen was difficult to reach, Sanchez would arrange for Allen to pre-sign cheeks so that Sanchez could use them to pay ADS expenses. Allen testified that Sanchez did not maintain a running balance in ADS’s checkbook and conceded that he did not challenge that practice. He testified that on occasion he requested to see bank statements for the account, but maintained that Sanchez, in response to his requests, offered only excuses as to why he could not provide the statements to Allen. With Sanchez handling the bank account and reviewing statements on ADS’s behalf, Allen had no direct contact with the bank between the initial meeting on October 2, 2003, and June 15, 2004, when he discovered the internet transactions at issue in this case.
Soon after ADS commenced work on the project, Sanchez, using the Oritani website, linked the new ADS account with two other preexisting ADS accounts that were approved for internet banking. According to Sanchez, he linked the three accounts because Allen’s unavailability made it difficult to pay expenses incurred in the Bergen-Hudson Light Rail project. Between October 15, 2003, and June 14, 2004, Sanchez made eighty-five transfers, totaling $613,972.26, from the dual-signature account to the two other ADS accounts that he had previously established on ADS’s behalf. He made six transfers, totaling $61,400, from ADS’s two other accounts to the dual-signature account. At trial, Allen *505 denied ever authorizing internet banking on the ADS account or having contemporaneous knowledge of these transfers.
According to Allen, on June 15, 2004, he discovered that Sanchez had made internet transfers of money from the dual-signature ADS account. That day, a check from the dual-signature account in the amount of $70,000, written to a company that Allen owned with his wife, failed to clear due to insufficient funds. Allen testified that, later that morning, a distraught Sanchez visited him and told him that “[tjhere’s no more money” in the account and that he had “used it for expenses.”
Allen immediately went to the Union City Oritani branch, seeking information about the account. After an Oritani employee refused to provide him with bank statements for the account, Allen spoke directly with branch manager Rocco Pinto. Pinto testified that Allen’s request to see statements for the dual-signature account was declined because Sanchez was not present to co-authorize the request. Allen testified, however, that Pinto gave him records of transactions on the ADS account conducted during the previous five months. Later, Allen’s wife obtained statements from Oritani covering the first three months of the account’s existence.
Notwithstanding these developments, Allen continued to work with Sanchez on the Bergen-Hudson Light Rail project for nearly a year. Sanchez made no further internet transfers of funds from or to ADS’s dual-signature account, and discontinued his participation in his business venture with Allen in April 2005. After Sanchez ceased working on the project, Allen continued to transact business for the project under the ADS name. Allen testified that he did not file criminal charges against Sanchez.
At trial, Sanchez refuted the suggestion that he stole money from ADS’s account. He testified that the Bergen-Hudson Light Rail contract was unprofitable and that, by the conclusion of the project, ADS was subject to numerous liabilities for which he was the personal guarantor. Sanchez stated that as a result of these remaining liabilities, he was forced to file for bankruptcy. Accord *506 ing to Sanchez, ADS suffered no damages due to Oritani’s conduct.
II.
On May 17, 2006, Allen filed this action in the Law Division, naming Oritani and Sanchez as defendants. After an initial period of discovery, Oritani moved for summary judgment to dismiss Allen’s complaint against it. Allen cross-moved for summary judgment and to amend the complaint to include ADS “as a [pjlaintiff by and through its treasurer Brendan Allen.” The trial court granted Oritani’s motion and dismissed Allen’s individual claims. However, it entered orders designating ADS as a plaintiff in this matter and stated that “nothing herein prevents [ADS] from asserting a corporate claim against Oritani.”
Oritani then filed a second motion for summary judgment seeking to dismiss the claims asserted by Allen on behalf of ADS. Allen’s counsel filed a cross-motion for partial summary judgment on behalf of a plaintiff designated as “ADS Associates Group, Inc. formerly Brendan Allen” seeking a declaration that $613,972 represented “an amount not authorized and not effective as the order of the customer or not enforceable against the customer with such declaration subject to [defendant's defenses.” The trial court denied Oritani’s summary judgment motion, denied ADS’s cross-motion for partial summary judgment, directed ADS to file an amended complaint naming itself as the plaintiff, and ordered further discovery.
Allen then filed an amended complaint in his own name as well as in the name of ADS. ADS and Allen asserted claims against Oritani for breach of contract, conversion, violation of various UCC provisions, general liability, negligence, gross negligence, breach of fiduciary duty and good faith, violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, and common law fraud.[5] In its answer to the amended complaint, Oritani asserted counterclaims *507 against Allen and ADS alleging, among other claims, that Allen fraudulently asserted a cause of action on ADS’s behalf without authorization in violation of New Jersey’s Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1. Oritani also asserted cross-claims against Sanchez.[6]
Prior to trial, at the request of Oritani’s counsel, Sanchez signed a resolution on behalf of ADS. The resolution stated that Allen lacked authorization to file suit or “otherwise take action on behalf of ADS,” that Allen’s counsel was not authorized to represent ADS, and that ADS had no cause of action against Oritani or Sanchez. Notwithstanding the terms of the resolution, the trial court denied Oritani’s third motion for summary judgment and entered an order authorizing Allen to prosecute claims against Oritani on ADS’s behalf.
With trial imminent, the trial court conducted a hearing pursuant to N.J.R.E. 104(a). During the course of that hearing, the trial court determined that Allen had standing to bring suit on behalf of ADS by virtue of the fact that he had a fiduciary duty to ADS as one of its officers. However, the court determined that Allen could not assert claims against Oritani on his own behalf.
The case was tried before a jury. Following the close of all evidence but before the case was submitted to the jury, the court considered the parties’ motions to dismiss brought pursuant to Rules 4:37 — 2(b) and 4:40-1. At a subsequent hearing, the trial court dismissed all the claims brought by Allen on behalf of ADS except for the claim premised on Oritani’s alleged violations of UCC Article 4A.[7] In dismissing the negligence claim, the trial *508 court reasoned that “because the internet transfers are covered by Article 4A any negligence or gross negligence claim based upon them is preempted by Article 4A.” The court also dismissed all counterclaims asserted by Oritani against plaintiffs except for the counterclaim alleging that plaintiffs violated the Frivolous Litigation Statute, N.J.S.A. 2A:15-59.1. Plaintiffs’ sole remaining claim — for Oritani’s alleged violation of UCC Article 4A — was submitted to the jury.
The jury returned a verdict in favor of ADS. It found that none of the internet transfers initiated by Sanchez between October 15, 2003, and June 14, 2004, had been authorized by ADS, and that ADS had objected to these transfers within one year of the date upon which it received notice of them. The jury awarded damages to ADS in the amount of $295,500. When the trial court inquired how the jury arrived at this figure, the jury responded that it represented the total amount of internet transfers from ADS’s new Oritani account between April 2, 2004, and June 14, 2004. The jury explained that this was “representative [of] 60 days from the date of notification.”[8]
On October 28, 2008, Oritani moved pursuant to Rule 4:40-2 for a judgment notwithstanding the verdict. The trial court granted *509 Oritani’s motion and dismissed ADS’s UCC claim with prejudice. It reasoned that the Account Agreement required ADS to indemnify Oritani for losses and expenses caused by Sanchez, who was a corporate officer when he transferred the disputed funds.
ADS and Allen appealed the trial court’s judgment.[9] The Appellate Division reversed the trial court’s determination. It ruled that in the wake of ADS’s resolution divesting Allen of the authority to litigate on its behalf, Allen no longer had the right to pursue ADS’s corporate claims against Oritani.
The panel, however, reasoned that although Allen was not Oritani’s customer, he could pursue common law claims on his own behalf against Oritani. The panel recognized a special relationship between Allen and Oritani within the meaning of this Court’s decision in City Check Cashing, supra, 166 N.J. at 59-62, 764 A.2d 411. In support of its finding of a “special relationship,” the panel cited Allen’s insistence on a dual-signature checking account in his October 2, 2003, meeting with Oritani’s representative and Sanchez, Oritani’s knowledge of ADS’s two preexisting accounts, trial testimony about Oritani’s internet policies, and the jury’s finding that Sanchez’s internet transfers were unauthorized by ADS. The panel reasoned that Oritani had a duty to disclose to Allen that the bank’s internet banking policy would allow Sanchez to move funds between ADS accounts under his control. It reversed the trial court’s order dismissing Allen’s individual common law negligence claims and remanded for a new trial.
We granted certification, limited to the issue of whether Allen may maintain a common law non-customer negligence claim against Oritani. 210 N.J. 260, 43 A.3d 1166 (2012).
III.
Oritani argues that the Appellate Division misapplied this Court’s decision in City Check Cashing, and that the panel granted *510 broader rights to Allen, a non-customer, than the rights accorded to customers. It contests the panel’s conclusion that Allen and Oritani had a “special relationship,” arguing that Allen established contact with Oritani only through ADS. Oritani contends that Allen’s claims are governed by Article 4A of the UCC, which precludes Allen from asserting a common law negligence claim. In the alternative, Oritani argues that New Jersey case law provides that banks have no duty to monitor or supervise the account activity of their depositors. Finally, Oritani argues that the record is devoid of evidence that would support a negligence claim because the parties never discussed internet transfers when Allen and Sanchez met with Oritani representatives to set up the account for ADS, and all parties were aware of ADS’s existing accounts at Oritani.
ADS and Allen maintain that the Appellate Division appropriately reinstated Allen’s common law negligence claims because Allen established a special relationship with Oritani, as recognized by this Court in City Check Cashing. They contend that this special relationship derived from Oritani’s representations to Allen, particularly its assurance that the account would require two signatures on each check in order for a withdrawal to be effected. They urge the Court to affirm the Appellate Division’s determination.
IV.
We review the trial court’s grant of Oritani’s motions for involuntary dismissal of Allen’s negligence claim, filed pursuant to Rule 4:37-2(b). A motion for involuntary dismissal is premised “on the ground that upon the facts and upon the law the plaintiff has shown no right to relief.” R. 4:37 — 2(b). The “motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiffs favor.” R. 4:37-2(b). If the court, “‘accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reason *511 ably and legitimately be deduced therefrom,’ ” finds that “ ‘reasonable minds could differ,’ ” then “ ‘the motion must be denied.’ ” Verdicchio v. Ricca, 179 N.J. 1, 30, 843 A.2d 1042 (2004) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544 (2000)). An appellate court applies the same standard when it reviews a trial court’s grant or denial of a Rule 4:37-2(b) motion for involuntary dismissal. Fox v. Millman, 210 N.J. 401, 428, 45 A.3d 332 (2012).
We review the trial court’s interpretation of Article 4A and all other legal determinations by the trial court de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) (“A trial court’s interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.”).
A.
At the outset, we address the impact of UCC Article 4A on Allen’s individual claim.[10] We interpret Article 4A in accordance with the Legislature’s direction that the UCC
shall be liberally construed and applied to promote its underlying purposes and policies, which are:
(1) to simplify, clarify, and modernize the law governing commercial transactions;
(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and
(3) to make uniform the law among the various jurisdictions.
[.N.J.S.A. 12A:l-103(a).]
UCC Article 4A was enacted by the Legislature in 1994 to address the subject of electronic funds transfers. N.J.S.A. 12A:4A-104(1) broadly defines “[fjunds transfer” to mean “the *512 series of transactions, beginning with the originator’s payment order, made for the purpose of making payment to the beneficiary of the order.” A bank customer’s transfer of money between two of its own accounts may constitute a “funds transfer” governed by Article 4A of the UCC. See N.J.S.A 12A:4A-104 cmt. 1 (noting that in some funds transfers within UCC definition, “the originator and the beneficiary may be the same person ... for example, when a corporation orders a bank to transfer funds from an account of the corporation in that bank to another account of the corporation in that bank”). Sanchez’s internet transfers fi’om the dual-signature ADS account that he established with Allen at Oritani to his other ADS accounts at Oritani clearly constitute “funds transfers” within the meaning of Article 4A. Accordingly, UCC Article 4A provides the statutory framework that governs the transactions at issue in this case.
Article 4A addresses in detail the circumstances under which a bank may conclude that a payment order for a transfer of funds is properly authorized. It provides that “[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency.” N.J.S.A. 12A:4A-202(1). Article 4A defines the customer’s rights, and limits the liability of the bank, when it accepts a payment order that turns out to be unauthorized. N.J.S.A. 12A:4A-202(2) provides:
If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.
[N.J.S.A. 12A:4A-202(2).]
“The effect of [N.J.S.A 12A:4A-202(2) ] is to place the risk of loss on the customer if an unauthorized payment order is accepted by the receiving bank after verification by the bank in compliance *513 with a commercially reasonable security procedure.” N.J.S.A. 12A:4A-203 cmt. 5.
A second provision, N.J.S.A 12A.-4A-203, protects the customer from the loss of funds under specified conditions:
The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like.
{N.J.S.A. 12A:4A-203(l)(b).]
That provision allows the customer to “avoid the loss resulting from ... a payment order if the customer can prove that the fraud was not committed by a person described in that subsection.” N.J.S.A. 12A:4A-203 cmt. 5.
A third provision of Article 4A, N.J.S.A. 12A:4A-204, defines the circumstances under which a customer may be awarded a refund of funds found to have been transferred without authorization. That provision
applies only to eases in which (i) no commercially reasonable security procedure is in effect, (ii) the bank did not comply with a commercially reasonable security procedure that was in effect, (iii) the sender can prove, pursuant to [N.J.S.A.] 4A-203(a)(2), that the culprit did not obtain confidential security information controlled by the customer, or (iv) the bank, pursuant to [N.J.S.A.] 4A-203(a)(l) agreed to take all or part of the loss resulting from an unauthorized payment order. IN.J.S.A. 12A:4A-204 cmt. 1.] [11]
Article 4A thus defines in detail the rights and obligations of banks and their customers in the event that funds are transferred *514 in accordance with a payment order that the customer has not authorized. Throughout the statutory provisions and their official comments, the word “customer” is used to describe the person or entity entitled to pursue a remedy against a bank if the statutory requirements for a cause of action are met. See, e.g., N.J.S.A 12A:4A-203(l)(b) (stating that a “receiving bank is not entitled to enforce or retain payment of [a] payment order if the customer proves” specified circumstances); N.J.S.A. 12A:4A:203 cmt. 5 (stating that “[t]he customer may avoid the loss resulting from” certain payment orders “if the customer can prove” particular circumstances exist). The term “customer” is specifically defined in the statute as “a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders.” N.J.S.A 12A:4A-105(l)(c).
Here, the definition of a customer does not apply to Allen. The record demonstrates that ADS was the customer, as defined by N.J.S.A 12A:4A-105(l)(c). ADS, not Allen, executed the Account Agreement dated October 4, 2003. ADS, not Allen, was the account holder for the Oritani account at issue under that Agreement. ADS, not Allen, was the party entitled to receive the bank statements. Although N.J.S.A. 12A:4A-501(1) provides that “the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party,” the Account Agreement between ADS and Oritani does not in any respect confer upon Allen the status of a customer for purposes of UCC Article 4A, or otherwise support Allen’s right to bring an individual claim against Oritani. Instead, the Account Agreement underscores the status of ADS as Oritani’s sole customer for the purposes of the disputed account.
The dissent relies on two eases, Schoenfelder v. Arizona Bank, 165 Ariz. 79, 796 P.2d 881, 883-84, 889 (1990), and First Nat’l Bank v. Hobbs, 248 Ark. 76, 450 S.W.2d 298, 299 (1970), for the proposition that Allen should be considered a “customer” of Oritani within the meaning of N.J.S.A. 12A:4A-105(l)(c). Post at 529-31, 99 A.3d at 365-66. Both Schoenfelder and Hobbs constituted applications of Article 4, not Article 4A, and were decided before *515 Article 4A was adopted by their states’ respective legislatures. See Ariz.Rev.Stat. Ann. §§ 47-4A101 to 47-4A507 (1991); Ark Acts 1991, No. 540 § 1 (Enacted March 14,1991).
Article 4 and Article 4A do not define the term “customer” in precisely the same way. For purposes of Article 4, N.J.S.A. 12A:4-104 defines “customer” to denote “a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank.” N.J.S.A. 12A:4-104(a)(5). In contrast, for purposes of Article 4A, N.J.S.A 2A:4A-105 connects the scope of the term “customer” directly to the payment orders that are the subject of Article 4A, defining the term to mean “a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders.” N.J.S.A 12A:4A-105(l)(c). Here, Allen clearly did not meet the narrow definition of “customer.” As confirmed by the Account Agreement, the “account holder” was ADS, not Allen, and the record contains no evidence that Oritani ever agreed to receive a payment order from Allen.
Moreover, in neither of the cases cited by the dissent was the plaintiff advised — as was Allen in this case — that he was not the account holder, and that he was not entitled to receive bank statements. See Schoenfelder, supra, 796 P.2d at 888; Hobbs, supra, 450 S.W.2d at 302. In contrast to the conduct of the defendant banks in Schoenfelder and Hobbs, Oritani never acted in a manner that could have induced Allen to believe that he was its “customer”; indeed, he was expressly told otherwise. The dissent cannot, and does not, cite a case in which an individual in Allen’s position has been deemed to be a “customer” for purposes of Article 4A.
In short, if N.J.S.A 12A:4A-203 or -204 afforded a remedy under the circumstances of this case, such a remedy would be available only to the “customer.” In this case, the sole customer of Oritani is ADS.[12]
*516 B.
In that setting, in which the Legislature has unequivocally limited claims against banks under N.J.S.A. 12A:4A-20S and -204, we consider whether Allen may assert a common law negligence claim against Oritani.
Prior to this case, no New Jersey appellate court has determined whether a non-customer, who claims damages arising from a funds transfer, may sue a bank under a common law negligence theory independent of Article 4A of the UCC. In other settings, however, our courts have addressed the availability of common law remedies in commercial disputes.
Notwithstanding its expansive language, “the UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction.” N.J. Bank, N.A. v. Bradford, Sec. Operations, Inc., 690 F.2d 339, 345 (3d Cir.1982). N.J.S.A. 12A:1-103(b) provides:
Unless displaced by the particular provisions of the [UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions. [N.J.S.A. 12A:l-103(b); see also N.J.S.A 12A:1-103 cmt. 4 (stating that “[t]he list of sources of supplemental law ... is intended to be merely illustrative ... and is not exclusive”).]
Addressing the UCC provisions that are now codified in New Jersey under N.J.S.A. 12A:1-103, the Third Circuit has stated that “[a]s a general rule, courts have read [the] principles of construction to mean that the [UCC] does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the UCC.” N.J. Bank, supra, 690 F.2d at 345-46; see Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat’l Bank, 390 N.J.Super. 199, 204, 915 A.2d 42 (App.Div.2007); Sebastian v. D & S Express, Inc., 61 F.Supp.2d 386, 391 (D.N.J.1999).
In City Check Cashing, supra, this Court considered whether a check-cashing service that was not the customer of the defendant bank could assert a common law cause of action against the bank, *517 which allegedly failed to respond to the service’s urgent request to authenticate a certified check. 166 N.J. at 52-55, 764 A.2d 411. Addressing the framework for check collection and payment set forth in Articles 3 and 4 of the UCC, the Court stated:
It is against that backdrop, and mindful of the balance of interests reflected in the Legislatures’ enactment of the [UCC]’s provisions, that most courts have been reluctant to sanction common law negligence claims. “Only in very rare instances should a court upset the legislative scheme of loss allocation and permit a common law cause of action.”
[Id. at 58, 764 A.2d 411 (quoting Bank Polska Kasa Opieki, S.A. v. Pamrapo Sav. Bank, S.L.A., 909 F.Supp. 948, 956 (D.N.J.1995)); see also Girard Bank v. Mount Holly State Bank, 474 F.Supp. 1225, 1239 (D.N.J.1979) (noting that “fcjourts should be hesitant to improvise new remedies outside the already intricate scheme of Articles 3 and 4”).]
Nevertheless, the Court observed “that implicit in those expressions of the need for restraint is a recognition that a common law duty, in fact, may arise and that its breach may be actionable in spite of the existence of the [UCC].” City Check Cashing, supra, 166 N.J. at 58-59, 764 A.2d 411 (citing Girard Bank, supra, 474 F.Supp. at 1239). The Court held that “in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [UCC].” Id. at 62, 764 A.2d 411.
In City Check Cashing, the Court found no special relationship that would support a common law cause of action arising from the defendant bank’s failure to respond to the plaintiff check-cashing service’s request to verify the authenticity of an altered certified check, prior to a midnight deadline imposed by a UCC provision. Id. at 62-63, 764 A.2d 411. The Court noted that the check-cashing service was not the bank’s customer, that it had no agreement with the bank, and that it had not promised an immediate response to its urgent request. Id. at 63, 764 A.2d 411.
In Brunson v. Affinity Federal Credit Union, the Court underscored its holding in City Check Cashing, noting that “in the unique context of whether a bank owes a duty to a non-customer, it is clear that ‘[a]bsent a special relationship, courts will typically *518 bar claims of non-customers against banks.’ ” 199 N.J. 381, 400, 972 A.2d 1112 (2009) (alteration in original) (quoting City Check Cashing, supra, 166 N.J. at 60, 764 A.2d 411); see also Psak, Graziano, Piasecki & Whitelaw, supra, 390 N.J.Super. at 204, 915 A.2d 42 (holding that “the UCC displaces the common law where reliance on the common law would thwart the purposes of the UCC”).
In that analytical framework, we consider whether a claim by Allen against Oritani premised upon common law negligence would contravene the provisions of UCC Article 4A. In that inquiry, we find substantial guidance in the official comments to Article 4A, which are promulgated on behalf of the National Conference of Commissioners on Uniform State Law and the American Law Institute.[13]
The Official Comment to N.J.S.A 12A:4A-102 states that Article 4A was intended to prescribe detailed requirements for funds transfers so that parties affected by such transfers may comply with those requirements and anticipate the risks assumed:
In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately.
[N.J.S.A 12A:4A-102 cmt. 1.]
That Official Comment further provides that Article 4A comprehensively governs the rights and remedies of parties affected by funds transfers:
*519 Funds transfers involve competing interests — those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.
[N.J.S.A. 12A:4A-102 cmt. 1.]
Accordingly, with respect to the categories of transactions within its reach, UCC Article 4A was intended to define the rights and obligations of the affected parties, and set forth the remedy for the breach of a duty.
In light of this expression of legislative intent, we consider the impact of Article 4A on Allen’s common law negligence claim, premised on his contention that Oritani was negligent when it permitted Sanchez to transfer funds among ADS’s three accounts at Oritani. The dispute in this case arises from a setting directly addressed by Article 4A — a bank’s acceptance of an order transferring funds from one account held by its customer to another of that customer’s accounts. Therefore, this matter is among the disputes for which the Legislature intended Article 4A to constitute “the exclusive means of determining the rights, duties and liabilities of the affected parties.” Ibid. Moreover, our recognition of the common law negligence action asserted by Allen in his individual capacity would contravene the essential objective of Article 4A: to provide definitive principles that allocate the risks and define the duties of banks effecting electronic transfers on behalf of their customers. Ibid.
As shown by the definition of customer in N.J.S.A. 12A:4A-105(l)(c), and the plain language of N.J.S.A. 12A:4A-202, -203 and -204, the Legislature clearly intended to impose upon banks specified duties to customers. Article 4A recognizes a cause of action against a bank for unauthorized transfers that may only be asserted by a customer. That statutory claim is not afforded to individual officers, directors, or employees of that customer. If *520 Allen were permitted to assert a common law negligence claim against Oritani, the “careful and delicate balancing” of competing interests that generated Article 4A would be undermined. N.J.S.A. 12A:4A-102 cmt. I.[14] Indeed, were we to permit a corporate officer to assert such a common law claim, the result might be to grant broader rights to non-customers than those afforded to customers in some settings, for instance where a customer has a viable Article 4A claim that is limited by the terms of the customer’s agreement with the bank. The recognition of a common law negligence claim — in this ease premised upon a special relationship such as that contemplated in City Check Cashing in the different setting of Articles 3 and 4 — would be precisely the type of “resort to principles of law or equity outside of Article 4A” that the Legislature expressly sought to avoid. N.J.S.A. 12A:4A-102 cmt. 1.
Our dissenting colleague contends that Allen should be permitted to maintain a “non-customer” claim under City Check Cashing for negligent misrepresentation, independent of Article 4A, based upon Oritani’s assurance that two signatures would be required for a check to be honored without disclosing the fact that transfers among ADS’s accounts could be effected by means of internet banking. Post at 533-34, 99 A.3d at 367-68. In his amended complaint, Allen did not plead a negligent misrepresentation claim as a non-customer of Oritani — indeed, he asserted no negligent misrepresentation claim of any kind. As his counsel stated to the trial court, Allen’s “City Check Cashing claim,” in which he *521 asserted that “there is a special relationship” with Oritani, was pled in Count Four of his amended complaint.[15] In Count Four, designated “General Liability, Negligence and Gross Negligence— Oritani,” Allen generally asserted a claim for negligence and gross negligence against Oritani, premised upon Oritani’s alleged failure to enforce its dual signature policy, permitting the disputed transfers to occur. That claim includes the elements of negligence, but does not state the elements of a cause of action for negligent misrepresentation, which must be pled with particularity in accordance with Rule 4:5-8. Accordingly, the negligent misrepresentation claim that our dissenting colleague contends should be permitted under City Check Cashing, supra, is not part of this case.[16]
*522 Moreover, even if the claim described by the dissent had been pled, such a claim would directly contravene the Legislature’s stated objectives in enacting Article 4A. As described by the dissent, the negligent misrepresentation claim would be premised upon the contention that because Oritani assured its customer, ADS, that two signatures would be required in order for a check from its account to be honored, it should not have authorized the electronic funds transfers in dispute. Post at 533-34, 99 A 3d at 367-68. In Article 4A, the Legislature has treated electronic funds transfers as a distinct category of transactions governed by special rules, and has carefully limited the liability of banks to refund money transferred in accordance with a payment order that the customer has not authorized. See N.J.S.A. 12A:4A-204. The negligent misrepresentation claim postulated by the dissent— devoid of any allegation that the bank failed to utilize an agreed-upon, commercially reasonable security procedure for the electronic transfer — would seek a remedy outside of the statutory parameters. Ibid.
In short, a decision authorizing Allen to assert a negligence claim in the setting of this case, in which he clearly lacks the status of a customer, would contravene the purpose and the terms of Article 4A. Accordingly, the trial court properly dismissed ADS and Allen’s common law negligence claim.
C.
Even if Article 4A’s language and intent did not itself bar a negligence claim, no duty of care premised upon a “special relationship,” as contemplated in City Check Cashing, could be found in the circumstances of this case. As this Court has noted, the determination of a duty “ ‘involves identifying, weighing, and balancing several factors — the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exer *523 cise care, and the public interest in the proposed solution.’” Brunson, supra, 199 N.J. at 403, 972 A.2d 1112 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993)). The duty of care recognized in City Check Cashing, supra, must be premised on a special relationship derived from the parties’ “agreement, undertaking or contact.” 166 N.J. at 62, 764 A.2d 411.
None of those sources of a special relationship can be found in this case. As defined in City Check Cashing, “[a]n agreement is essentially a meeting of the minds between two or more parties on a given proposition.” Ibid, (citing Black’s Law Dictionary 44 (6th ed. 1991)). “An undertaking is the willing assumption of an obligation by one party with respect to another or a pledge to take or refrain from taking particular action.” Ibid, (citing Black’s Law Dictionary 1060 (6th ed. 1991)).
Here, Oritani had no direct contract with, or undertaking for the benefit of, Allen as an individual. The Account Agreement provided that ADS was the account holder and thus the bank’s customer, that ADS held the title to the “Business Checking Account” maintained by Oritani, and that Oritani had an obligation to send statements only to ADS. Nothing in the Account Agreement remotely suggests a duty on the part of Oritani to detect potentially fraudulent conduct by Sanchez and to report it to Allen. See Globe Motor Car v. First Fidelity, 273 N.J.Super. 388, 395, 641 A.2d 1136 (Law Div.1993) (noting that “[ajbsent a contractual duty, a bank has no obligation to manage, supervise, control or monitor the financial activity of its debtor-depositor and is not liable to its depositor in negligence for failing to uncover a major theft”).
To the contrary, the Account Agreement required ADS to “examine the [monthly statement issued by Oritani] and report any problem or error with an account statement within 60 days after the statement is sent to [ADS].” Failure to do so meant that Oritani would “not [be] liable for such problem or error.” There *524 was no “undertaking” on the part of Oritani to constrain Sanchez’s ability to transfer funds among the multiple accounts held by ADS at the bank. Further, if Oritani had any obligation to disclose its internet banking policy, that obligation was to share that policy with ADS, not with Allen in his individual capacity.
Moreover, the record does not indicate that Oritani misled Allen to believe that he held the status of a customer. Instead, it establishes that Oritani clearly informed Allen that his status as a signatory did not make him a customer; its representative told Allen that bank statements would be sent to ADS in care of Sanchez, and that no duplicate statements would be sent to him. Accordingly, no special relationship can be premised upon an agreement or an undertaking in this case. See City Check Cashing, supra, 166 N.J. at 62, 764 A.2d 411.
In City Check Cashing, the Court characterized “contact,” comparing it to agreements and undertakings, as “the loosest of the three terms, defined as the ‘establishment of communication with someone.’ ” Id. at 62, 764 A.2d 411 (quoting Webster’s Ninth New Collegiate Dictionary 282 (9th ed. 1984)). Allen’s “contact” with Oritani was limited to two visits: Allen’s October 2, 2003 meeting with Fabregas and Sanchez to open the dual-signature ADS account, and Allen’s June 15, 2004 visit to the bank after he learned of Sanchez’s transfers of funds. The record reveals no contact at all between Allen and Oritani during the period in which Sanchez conducted the disputed transfers, much less a communication that would have alerted Oritani to monitor ADS’s account activity. Indeed, despite ADS’s contractual obligation to alert Oritani to any problem or error reflected in a bank statement within sixty days of the issuance of that statement, Oritani received no communication from ADS, Allen or Sanchez regarding any such concern. Thus, there was no contact between Allen and Oritani that would support a finding of a special relationship in this case. Even if Allen’s claim was not barred by Article 4A of the UCC, no such special relationship could be recognized based on the record in this case.[17]
*525 In sum, UCC Article 4A was enacted to comprehensively define the rights and remedies of parties affected by the funds transfers governed by the statute’s terms. The plain language of N.J.S.A. 12A:4A-105(l)(c) makes clear that Allen is not a customer entitled to assert a claim against Oritani. Allen’s assertion of a common law negligence claim in this case, premised on a special relationship such as that contemplated by this Court in City Check Cashing, contravenes the language and purpose of Article 4A. Accordingly, the trial court properly dismissed Allen’s negligence claim.[18]
V.
The determination of the Appellate Division panel is reversed, and the judgment of the trial court is reinstated.

 "ADS” stands for Asnel Diaz Sanchez.

 At a pretrial hearing, Sanchez maintained that once all expenses were paid, ADS was to receive thirty percent of the profits "off the top ... for being at risk and taking all the liability and responsibility for the job,” and that the remaining profits were then to "be split 70/30.”

 During his testimony, Allen expressed confusion as to when the parties signed the Account Agreement, but the document bears the date October 4, 2003.

 Branch Manager Rocco Pinto testified that by 2008, when the trial took place, Oritani required each signatory on a dual-signature account to fill out a separate internet banking application, and that in the absence of such an application executed by both parties with signing authority, internet transactions on the account would be considered unauthorized. Pinto, however, was unfamiliar with the internet banking policy that existed in 2003, and did not provide testimony regarding Oritani’s internet banking policy during the relevant time.

 In addition to their claims against Oritani, ADS and Allen asserted claims for breach of contract, conversion, misrepresentation and fraud, and breach of *507 fiduciaiy duty against Sanchez in the amended complaint. The amended complaint notes that all claims against Sanchez had been stayed pending bankruptcy proceedings.

 Oritani's answer to the amended complaint notes that the bank’s cross-claims against Sanchez had been stayed as a result of his bankruptcy.

 At the end of ADS’s and Allen’s proofs, Oritani moved to dismiss plaintiffs' claims, including the negligence and gross negligence claims, pursuant to Rule *508 4:37-2(b). At the close of all evidence, the parties disputed whether Oritani could also move for judgment pursuant to Rule 4:40-1. The trial court found that nothing in Rule 4:40-1 barred Oritani from making such a motion. The trial court evidently applied the standards of both Rule 4:37-2(b) and Rule 4:40-1 in denying Oritani's motion to dismiss the UCC claims served by ADS and Allen, and dismissed ADS's and Allen's negligence claims pursuant to Rule 4:37-2(b).

 On October 21, 2008, ADS filed a motion for additur, by which it sought to increase the jury’s verdict by $318,472.26. ADS also sought an award of interest, attorneys' fees and expenses, and an entry of final judgment. ADS subsequently withdrew its motion for additur, but did not withdraw its motions for interest, attorneys' fees and expenses, and an entry of final judgment. On November 14, 2008, ADS moved for a judgment notwithstanding the verdict, seeking to increase the amount of the judgment to $613,972.26 and incorporating its prior motions for interest and attorneys' fees. The trial court ultimately denied the motions.

 Oritani filed a cross-appeal from the denial of its motion for attorneys’ fees and costs. The issues raised in the cross-appeal are not before this Court.

 Contrary to the suggestion of the dissent, post at 528-29, 99 A.3d at 365, we do not exceed the scope of our grant of certification, but analyze the principles of Article 4A, N.J.S.A. 12A:4A-101 to -507, as applied to this case in order to determine whether Allen can maintain a common law non-customer claim against Oritani.

 A refund awarded to a customer may include interest on the amount refunded "calculated from the date the bank received payment to the date of the refund." N.J.SA. 12A:4A-204(1). The amount of interest awarded may, however, be affected by a customer’s failure to exercise ordinary care to discover and report the unauthorized payment order. N.J.SA. 12A:4A-204(1). Moreover, a customer’s ability to seek a refund from a receiving bank may be limited by N.J.S.A. 12A:4A-505.

 We do not reach the issue of whether ADS could assert a claim against Oritani under Article 4A of the UCC in the circumstances of this case. Only Allen's individual claims are before the Court.

 The UCC Article 4A Prefatory Note of National Conference of Commissioners on Uniform State Laws and the American Law Institute states that the "[cjomments that follow each of the sections of [Article 4A] are intended as official comments. They explain in detail the purpose and meaning of the various sections and the policy considerations on which they are based.”

 Two reported cases from other jurisdictions that addressed this issue in settings governed by Article 4A have barred the common law claims asserted. See Corfan Banco Asuncion Paraguay v. Ocean Bank, 715 So.2d 967, 968, 970-71 (Fla.Dist.Ct.App.) (barring plaintiff's negligence claim premised on allegation that bank incorrectly accepted transfer despite incorrect account number because UCC Article 4A provided exclusive remedy), rev. dismissed, 728 So.2d 203 (Fla.1998); Aleo Int'l, Ltd. v. Citibank, N.A., 160 Misc.2d 950, 612 N.Y.S.2d 540, 541 (N.Y.Sup.Ct.1994) (dismissing negligence claim for failure to cancel transfer, in light of UCC Article 4A provisions that governed cancellation and Comment to UCC 4-A-102).

 Arguing that Count Four should be construed as a claim for negligent misrepresentation, our dissenting colleague does not rely on the negligence claim in Count Four itself, but on allegations of fraud and misrepresentation. Post at 527-29, 99 A.3d at 364-65. In Count Six, ADS and Allen asserted a claim for common law fraud, premised upon ADS’s status as Oritani's customer, and alleged the elements of that claim, including affirmative misrepresentations and reliance. In addition, ADS and Allen asserted a misrepresentation claim against Sanchez in Count Nine. Allen identified only the negligence claim of Count Four — not the fraud claim set forth in Count Six or the misrepresentation claim alleged in Count Nine — as his individual claim against Oritani premised upon City Check Cashing. In that claim — the sole non-customer claim asserted in this case — Allen alleges the elements of negligence, but made no attempt to plead a cause of action for negligent misrepresentation. Accordingly, the dissent postulates a City Check Cashing non-customer claim for negligent misrepresentation that was never asserted in this case.

 The cases which our dissenting colleague cites in support of his argument that Article 4A was not intended "to repeal the law of misrepresentation, or allow banks a free hand to deceive the public" involve allegations ol fraud and misconduct that are not reflected by the facts of the instant case. See Regions Bank v. Provident Bank, Inc., 345 F.3d 1267, 1275 (11th Cir.2003) (involving claims "based on the theory that [the defendant] bank accepted funds when it knew or should have known that the funds were fraudulently obtained”); Regions Bank v. Wieder & Mastroianni, P.C., 423 F.Supp.2d 265 (S.D.N.Y.2006) (arising from same factual circumstances involving claims of actual fraudulent transfer); Dubai Islamic Bank v. Citibank, N.A., 126 F.Supp.2d 659, 661-62 (S.D.N.Y.2000) (involving claims that defendant Citibank maintained "a secretive department ... as a tool for wealthy patrons to accomplish secret, untraceable financial transaction without regard to the legality or legitimacy of such *522 transactions,” and facilitated efforts of "a reputed international financial terrorist”).

 In contending that we ”consign[] into irrelevance” City Check Cashing, our dissenting colleague misreads our opinion. City Check Cashing was decided in the very different context of an Article 4 claim. In the Article 4 setting, the common law claims contemplated by City Check Cashing are not subject to the limitations that apply in fund transfer cases governed by Article 4A. The viability of City Check Cashing is unaffected by this opinion, which addresses claims arising from funds transfers regulated by N.J.S.A. 12A:4A-101 to -507.

 The trial court's entry of judgment notwithstanding the verdict in favor of Oritani, following the dismissal of Allen's individual claims, was premised upon ADS's obligation to indemnify Oritani for any losses and expenses caused by Sanchez. Because the Appellate Division's determination that Allen had no authority to assert claims on ADS's behalf is not under review, ADS has no judgment against Oritani, and the issue of indemnification is moot.